**William G. TINKER, Appellant,**

v.

**VECO, INC., Eagle Pacific Insurance Co., Alaska Insurance Guaranty Assoc., and the Alaska Workers' Compensation Board, Appellees.**

No. S–6809.

Supreme Court of Alaska.

March 29, 1996.

Charles W. Coe, Anchorage, for Appellant.

Clay A. Young, Delaney, Wiles, Hayes, Reitman & Brubaker, Inc., Anchorage, for Appellees Veco, Inc. and Alaska Insurance Guaranty Assoc.

Phillip J. Eide, Eide & Miller, P.C., Anchorage, for Appellees Veco, Inc. and Eagle Pacific Insurance Co.

Before COMPTON, C.J., RABINOWITZ, and MATTHEWS, JJ., and CARPENETI, J. Pro Tem.*

## OPINION

COMPTON, Chief Justice.

William G. Tinker appeals a decision of the superior court affirming the denial of his compensation claims by the Alaska Workers' Compensation Board (the Board). The Board denied one claim for failure to give timely notice, a second claim for failure to establish a *prima facie* case for compensation, and a third claim for failure to establish all elements of the claim by a preponderance of evidence, once the presumption of compensability had been rebutted. We affirm the decisions of the Board and the superior court as to the second and third claims, but reverse their decisions on the first claim. We hold that Tinker's failure to give notice should have been excused. We remand the case for further proceedings on this claim.

## I. Background

William G. Tinker has suffered from diabetes since the mid–1970s. People who suffer from diabetes are particularly vulnerable to a range of foot problems, collectively referred to as "diabetic foot." Diabetes may sometimes interact with an unrelated foot injury to produce severe complications. Diabetes-related foot conditions can progress to the point that amputation becomes necessary.

Tinker began working for Veco, Inc. (Veco) in 1985 as an equipment manager on the North Slope. He claimed he suffered frostbite to his right foot in February 1986, while on the job moving equipment at the Kuparuk field. Shortly thereafter he discovered a blister on his right big toe. Tinker did not fill out a written report of the frostbite incident, although he did inform Veco project manager Grover Moreland and construction superintendent Marvin King about the incident.

The blistered toe on the right foot soon became infected. By the time it began to heal, the big toe on his left foot started getting red and sore; the toe on that foot required surgery later in 1986.[1] In 1987 Tinker had surgery for a "hammer toe" on his right foot. Both feet later became red and swollen. They were operated on in December 1988. Tinker returned to work in January 1989, at which time he filled out a report of occupational injury for the 1986 frostbite incident. This report was the first he filled out regarding any injuries to his feet. Tinker had further foot problems and surgery through 1989 and 1990.

Tinker claimed he injured his left ankle and foot on the job in December 1990, when he slipped on ice while stepping off a truck. Upon examination, Tinker was diagnosed as having Charcot osteoarthropathy in his left foot, a diabetes-related condition in which the bones of the foot become demineralized and weakened, break down, and assume an abnormal position. He underwent further foot surgery in April 1991, in which bone was removed from both of his feet.

In May 1991 Tinker returned for the last time to his work on the North Slope, but he had to be evacuated to Anchorage when he became ill in early June. He attributes this illness to food poisoning from a meal at the

---

* Sitting by assignment made pursuant to Article IV, section 16 of the Alaska Constitution.

1. There was conflicting medical testimony before the Board as to whether frostbite to the right foot might ultimately result in injury to and possible amputation of the left. One doctor testified that changes in gait due to the right toe ulcer might have resulted in additional pressure on and injury to the left foot. A second doctor testified that he could not make a connection between frostbite to the right foot and injury to the left.

The second doctor did go on to testify, however, that the majority of the 1,200 frostbite patients he had treated suffered frostbite to both limbs, and that it was possible that if Tinker had sustained a cold injury to his right foot he also may have sustained such an injury to his left foot as well. A third doctor testified that Tinker had told her in 1986 that he had frostbitten both feet, although the compensation claim he filled out in 1989 only mentions frostbite to the right foot.

company mess hall. Swelling in his left foot then led to further surgery later in June.

In November 1991, Tinker's left leg had to be surgically amputated below the knee.

Proceedings before the Board had been initiated by the time Tinker's leg was amputated. In September 1991 Tinker filed an application for adjustment of claim against Veco and its insurance carrier, the Eagle Pacific Insurance Company (Eagle Pacific), after they controverted claims he made for compensation stemming from the 1990 foot injury and the 1991 food poisoning. Eagle Pacific claimed that any problems with Tinker's feet stemmed from his diabetes, not from the fall or any food poisoning. In April 1992, several months after the amputation, Eagle Pacific filed a petition requesting that Pacific Marine Insurance Company (PacMar), Veco's insurance carrier at the time of Tinker's 1986 frostbite injury, be joined as a party to the claim; it argued that the 1986 incident was the original injury that "allegedly caused his current condition." Because PacMar was insolvent, the Alaska Insurance Guaranty Association (AIGA) appeared as a party instead.

Tinker argued before the Board that the amputation was a compensable result of the 1986 frostbite injury to his right toe, the 1990 ankle injury, and the 1991 food poisoning.[2] The Board rejected the frostbite claim, finding that notice of the injury was not properly given under AS 23.30.100(b), and that this failure to provide proper notice was not excusable under AS 23.30.100(d)(1). It rejected the ankle injury claim, finding that Tinker

had failed to present any evidence connecting the ankle injury with the later need for surgery and amputation, thus failing to raise the presumption of compensability. Regarding the food poisoning claim, the Board found that Tinker had produced enough evidence to raise the presumption of compensability, but that Veco had provided substantial evidence rebutting this presumption. The Board then found that Tinker had failed to prove all elements of this claim by a preponderance of the evidence, as he had to do once the presumption was rebutted. Thus, the Board rejected all of Tinker's claims for compensation. The superior court sitting as an intermediate appellate court affirmed the Board's decision, and Tinker now appeals.

## II. Tinker's Failure to Give Timely Notice of his 1986 Frostbite Injury was Excusable

AS 23.30.100(a) requires that notice of an injury be given to the Board and the employer within thirty days of the injury; AS 23.30.100(b) requires that such notice be in writing.[3] Tinker did not give written notice of the frostbite injury until January 1989, almost three years after the injury was sustained. Thus, the Board correctly found that he had failed to give timely notice of this injury.

■ The Board then proceeded to determine whether this failure was excusable under AS 23.30.100(d)(1).[4] Two requirements must be met before this excuse can be applied: first, knowledge of the injury by the employer, in-charge agent, or carrier, and

---

**2.** Tinker's diabetes would not have barred his compensation claim, so long as the injury he received on the job aggravated, accelerated, or combined with his medical condition in a manner that resulted in the loss of the leg. See *Burgess Constr. Co. v. Smallwood*, 623 P.2d 312, 315 (Alaska 1981) (*Smallwood II*); *Cook v. Alaska Workmen's Comp. Bd.*, 476 P.2d 29, 32 (Alaska 1970); *Thornton v. Alaska Workmen's Comp. Bd.*, 411 P.2d 209, 210 (Alaska 1966).

**3.** Sec. 23.30.100. **Notice of injury or death.** (a) Notice of an injury or death in respect to which compensation is payable under this chapter shall be given within 30 days after the date of such injury or death to the board and to the employer.

(b) The notice must be in writing, contain the name and address of the employee and a state-

ment of the time, place, nature, and cause of the injury or death, and be signed by the employee or by a person on behalf of the employee, or in the case of death, by a person claiming to be entitled to compensation for the death or by a person on behalf of that person.

**4.** AS 23.30.100(d)(1) provides:

(d) Failure to give notice does not bar a claim under this chapter

(1) if the employer, an agent of the employer in charge of the business in the place where the injury occurred, or the carrier had knowledge of the injury or death and the board determines that the employer or carrier has not been prejudiced by failure to give notice....

second, a lack of prejudice to the employer or carrier. The Board found that King and Moreland were agents in charge of Veco's business at the time and place of the frostbite injury. It concluded that their knowledge of the frostbite satisfied the first requirement under section 100(d)(1). It then found, however, that the second requirement had not been met because the employer had been prejudiced by the failure to give timely written notice of the injury.

■ Tinker challenges the Board's finding of prejudice, claiming that there was insufficient evidence to support this finding. This court reviews findings of the Board under the substantial evidence standard and will not vacate findings of the Board that are supported by such evidence. *Alaska State Hous. Auth. v. Sullivan,* 518 P.2d 759, 760 (Alaska 1974). However, the ultimate question of whether the quantum of evidence is itself substantial is a legal question, for which the court will independently review the evidence. *Fireman's Fund American Insurance Cos. v. Gomes,* 544 P.2d 1013, 1015 (1976). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.; Sullivan,* 518 P.2d at 760–61.

■ Timely written notice of an injury is required both because it lets the employer provide immediate medical diagnosis and treatment to minimize the seriousness of the injury, and because it facilitates the earliest possible investigation of the facts surrounding the injury. *State v. Moore,* 706 P.2d 311, 312 (Alaska 1985); *Sullivan,* 518 P.2d at 761; *Morrison–Knudsen Co. v. Vereen,* 414 P.2d 536, 537 (Alaska 1966). Thus a failure to provide timely notice that impedes either of these two objectives prejudices the employer.

■ To evaluate whether Tinker's failure to submit written notice prejudiced his employer, we must first ask whether this written notification would have informed Veco of anything about which Tinker had not already told King and Moreland. If a legally sufficient written notification would have only duplicated the same information Tinker already had communicated verbally to Veco through its in-charge agents, it would require an exceptional set of circumstances for this difference in the form by which the information was conveyed to prejudice the employer.

Tinker told King and Moreland what he knew of his injury at the time: that he had suffered frostbite while moving equipment at Kuparuk. Written notice containing identical information would have constituted a legally sufficient "statement of the time, place, nature, and cause of the injury" as required by section 100(b).[5] No additional information would have been necessary.[6]

No substantial evidence in the record supports the finding that Veco was prejudiced simply because the knowledge it obtained was received through a verbal communication, instead of a written notification. Had an intervening event prevented King and Moreland from communicating to Veco the information they had received, there might be a factual basis for finding that Tinker's failure to convey information through formal, written channels had prejudiced Veco. Here, however, no such situation existed. Through its in-charge agents, Veco had received all of the information a written notice of injury would have conveyed. Nothing prevented these in-charge agents from informing the appropriate company personnel of an injury that had occurred at a worksite under their control; any prejudice that may have resulted is attributable to a failure of communication within the company and not to the manner in which Tinker informed it of his injury.[7]

---

5. When questioned at oral argument, counsel for Veco and AIGA conceded that written notice would have required only this minimal information.

6. Indeed, such notice probably could not have contained more information, since Tinker apparently did not know any more about his injury at the time.

7. Veco claims it was prejudiced because Tinker should have notified "safety man" Jamie Slack of his injury; Moreland "did not fill out an accident or injury report form, and he would not have been the one in the company to do so."

This argument fails because in-charge employees have a statutory responsibility to report injuries that come to their knowledge, and employers can be held accountable for their failure to do so. *See* AS 23.30.070(e) (If "an agent of the employer

Tinker did not deprive Veco of the opportunity either to investigate the injury or to seek prompt medical diagnosis and treatment. Because no substantial evidence supports the assertion that Tinker's failure to give notice could have prejudiced Veco in any way, the Board's finding of prejudice must be reversed.

On remand, the Board will first need to determine whether Tinker's claim was timely filed under AS 23.30.105. If the Board finds that the claim was timely filed, it must then address this claim on its merits.

### III. *The Board Correctly Applied the Presumption of Compensability in Rejecting Tinker's Claims for Compensation Based on his 1990 Ankle Injury and 1991 Illness*

■■■ AS 23.30.120(a)(1) creates a presumption in favor of compensability.[8] In cases involving pre-existing medical conditions, the aggravation or acceleration of the condition by the injury must be presumed. *Burgess Construction Co. v. Smallwood*, 623 P.2d 312, 315 (Alaska 1981) (*Smallwood II* ). However, the presumption does not attach until the employee establishes a preliminary link between the disability and the employment. Furthermore, "in claims 'based on highly technical medical considerations' medical evidence is often necessary in order to make that connection." *Id.* at 316 (quoting *Commercial Union Cos. v. Smallwood,* 550 P.2d 1261, 1267 (Alaska 1976) (*Smallwood I* ). Once the employee makes a *prima facie* case of work-relatedness, the presumption of compensability attaches and shifts the burden of production to the employer. *Veco, Inc. v. Wolfer,* 693 P.2d 865, 869 (Alaska 1985). To overcome the presumption of compensability, the employer must then present substantial

evidence that the disability is not work-related. *Miller v. ITT Arctic Servs.,* 577 P.2d 1044, 1046 (Alaska 1978). This can be accomplished either by producing affirmative evidence that the injury is not work-related or by eliminating all reasonable possibilities that the injury is work-related. *Smallwood II,* 623 P.2d at 316. Medical evidence may be necessary to rebut the presumption of compensability, depending on "the probative value of the available lay evidence and the complexity of the medical facts involved." *Veco,* 693 P.2d at 871. Once the presumption of compensability is rebutted, the employee must prove all elements of her case by a preponderance of the evidence. *Id.* at 870.

The Board found that no medical evidence in the record supported Tinker's claim that his 1990 ankle injury aggravated, accelerated, or combined with his pre-existing condition to become a substantial factor in his need for surgery and amputation in 1991.[9] Thus it concluded that Tinker failed to establish a *prima facie* case and that the presumption of compensability had not attached as to this claim.

■■■ The question of whether Tinker met the necessary quantum of evidence to establish a *prima facie* case is a legal question, and this court will independently review the evidence in answering it. *See Fireman's Fund,* 544 P.2d at 1015.

■■■ Tinker argues that there was sufficient medical evidence in the record to establish a preliminary link between his 1990 ankle injury and his 1991 surgery and amputation. He cites to *Smallwood II,* 623 P.2d 312, for support. In *Smallwood II,* a doctor testified that "working conditions played a significant role" in the employee's disability; the court found that this testimony created a

---

in charge of the business in the place where the injury occurred ... has knowledge of an injury ... and fails, neglects, or refuses to file a report of it as required by (a) of this section, the limitations in AS 23.30.105(a) of this chapter do not begin to run against the claim ... until the report has been furnished as required [by] (a) of this section.").

**8. Sec. 23.30.120. Presumptions.** (a) In a proceeding for the enforcement of a claim for compensation under this chapter it is presumed, in

the absence of substantial evidence to the contrary, that

(1) the claim comes within the provisions of this chapter. . . .

**9.** The Board found that this claim involved highly technical medical considerations and that lay evidence would be of little probative value; thus it concluded that medical evidence would be necessary to establish the preliminary link between the employment and the need for surgery.

preliminary link. 623 P.2d at 314, 316. There was no comparable testimony in this case. The closest any testimony came to establishing such a link was in the testimony of a Dr. Mills, and it is clear from reading more than an isolated line or two of this testimony that this doctor strongly resisted Tinker's attempts to get him to testify that, in his professional judgment, the 1990 ankle injury and collapsed arch could have been a substantial factor in the amputation:

> Q. Would you be able to state an opinion as to whether or not this injury ... to Mr. Tinker's left foot could cause an infection or an ulceration or lesion in Mr. Tinker's left foot which could culminate in his below-the-knee amputation of his left foot in November of '91?
>
> .    .    .    .
>
> A. It would cause all those things, but my point, my idea of that was I didn't think of it as an injury. It was a gradual, destructive process, if you wish, that was occurring in his foot. It happened that he suddenly might have become aware of it.
>
> But anyway, it was a totally—it caused massive changes in his foot that eventually, with overwhelming infection, resulted in amputation. And that's a very common thing.
>
> . . . .
>
> I can see very much that he would have a so-called collapse of his arch. But it's primarily a collapse secondary to destruction of all his tarsi or many of his tarsi.
>
> .    .    .    .    .
>
> Using your own word, the kind of foot he had in itself is an eggshell. It's demineralized and there are changes you've seen on X-ray with this displacement of bone, so there's not much substance to hold that foot together.

This is not testimony suggesting that the 1990 fall may have played a significant role in the amputation. Our review of the evidence before the Board leads us to the same conclusion reached by the Board. There was no

medical evidence suggesting that the 1990 fall might have played a significant role in the amputation, and Tinker's claim for compensation based on that fall was properly denied.

Tinker also claims that his 1991 illness resulted from food poisoning at his place of employment, that this work-related illness spread bacteria throughout his body, and that this bacteria then seeded an infection in his foot that led to its amputation. Because Dr. Aubuchon, one of the doctors who examined Tinker, testified that he could not rule out the possibility that Tinker had sustained food poisoning which could have resulted in the infection of his left foot, the Board found that Tinker had presented a *prima facie* case that the amputation was work-related.[10] It then found that Eagle Pacific had provided substantial medical evidence rebutting the presumption. At that point, Tinker was required to prove all elements of his claim by a preponderance of the evidence, which the Board found he had failed to do. Tinker argues that the Board erred in concluding that Eagle Pacific provided the substantial evidence needed to rebut the presumption.

■■■■ This court will independently review the evidence to determine whether it meets the necessary quantum of substantiality. *See Fireman's Fund,* 544 P.2d at 1015. In reviewing the substantiality of the evidence offered to rebut the presumption of compensability, this court will examine that evidence by itself and will not weigh it against evidence tending to establish causation. *Veco,* 693 P.2d at 869–70. Substantial evidence overcomes the presumption if it " 'either (1) provides an alternative explanation which, if accepted, would exclude work related factors as a substantial cause of the disability; or (2) directly eliminates any reasonable possibility that employment was a factor in causing the disability.' " *Big K Grocery v. Gibson,* 836 P.2d 941, 942 (Alaska 1992) (quoting *Grainger v. Alaska Workers' Comp. Bd.,* 805 P.2d 976, 977 (Alaska 1991)).

10. As with the ankle injury claim, the Board found that this claim involved highly technical medical considerations and that lay testimony was of little probative value. Thus it required

medical evidence, both to establish the preliminary link and to rebut the presumption of compensability.

 Considerable medical evidence documents the progression of Tinker's foot problems from the 1986 frostbite incident to the time of his 1991 illness. This evidence creates a "strong inference" that Tinker's illness was not itself a substantial cause of the amputation. *See Burgess Construction Company v. Smallwood,* 698 P.2d 1206, 1211 (Alaska 1985) (*Smallwood III*). We therefore conclude that the medical evidence concerning Tinker's foot problems from 1986 to 1991 eliminates any reasonable possibility that his employment during May and June, 1991, was a factor in causing his amputation.

## IV. *Conclusion*

We AFFIRM the decisions of the Board and the superior court as to the 1990 ankle injury and 1991 food poisoning claims against Veco and Eagle Pacific. We REVERSE the decisions of the Board and the superior court as to the 1986 frostbite claim against Veco and AIGA, and remand the case for further proceedings before the Board. On remand, the Board must determine whether Tinker's frostbite claim was timely filed under AS 23.30.105. If the claim was timely filed, the Board must decide this claim on its merits.

MOORE and EASTAUGH, JJ., not participating.