**Anthony A. COGGER, Appellant,**

v.

**ANCHOR HOUSE and Wausau Insurance Company, Appellees.**

No. S–6959.

Supreme Court of Alaska.

April 18, 1997.

Michael J. Jensen and Debra Fitzgerald, Law Offices of Michael J. Jensen, Anchorage, for Appellant.

Tracey L. Knutson, DeLisio Moran Geraghty & Zobel, Anchorage, for Appellees.

Before COMPTON, C.J., RABINOWITZ, MATTHEWS and EASTAUGH, JJ., and CARPENETI, J. Pro Tem.*

*OPINION*

CARPENETI, Justice Pro Tem.

## I. *INTRODUCTION*

Anthony Cogger (Cogger) appeals from the rejection of his worker's compensation claim. The Alaska Workers' Compensation Board (Board) found Cogger's claim barred by his failure to report his injury on time. The superior court affirmed. Because we conclude that Cogger's employer had actual notice of his injury and was not prejudiced by his failure to provide formal notice, we reverse the superior court's decision and remand to the Board to determine the compensability of Cogger's injury.[1]

## II. *FACTS AND PROCEEDINGS*

Anchor House, a residential treatment facility in Anchorage, hired Anthony Cogger as a resident manager in June 1990. In June 1991, Cogger accepted additional maintenance responsibilities. His work at Anchor House involved heavy lifting; for "milk runs" and "Costco runs" he moved heavy crates, and on at least one occasion he had to lift a patient out of a bathtub. Cogger's employment at Anchor House ended in October 1992, when he left for a less physically strenuous position elsewhere.

Cogger had injured his back in September 1989 during previous employment as a secu-

---

\* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

**1.** This conclusion is based at least in part upon our retreat today from the dictum in *State v.* *Moore,* 706 P.2d 311, 312 (Alaska 1985). *See Kolkman v. Greens Creek Mining Co.,* 936 P.2d 150 (Alaska 1997). *See* text *infra* at 162 and note 5.

rity guard. Cogger maintained that his prior back injury healed after eight or nine months, that is, in April or May 1990, shortly before he began work at Anchor House. One of Cogger's supervisors at Anchor House testified, however, that Cogger complained about back pain during his entire tenure there, particularly on the milk runs and Costco runs.

Cogger states that in April 1992 he injured his back while carrying a thirty to forty-pound toolbox up a stairway to repair a door at Anchor House. After pausing briefly on the stairway, he resumed his duties. The result of the April injury, he says, was a sharp back pain that bothered him severely for the rest of that day and required him to take over-the-counter painkillers regularly afterwards.

The parties agree that Cogger was the only eyewitness to the toolbox incident, and that Cogger did not consider it sufficiently serious at the time to report it formally, either through worker's compensation or in the Anchor House daily log. Nor did Cogger seek medical attention at that time or stop work: he says that he thought that his condition would improve on its own, and that he should "be the tough guy" and work through the injury. Cogger states that he told co-workers and some supervisors about the injury, and that his co-workers also told supervisors, so his injury was common workplace knowledge, although he did not formally report it. Anchor House and its insurer Wausau Insurance Company (collectively Anchor House), state that Cogger's coworkers knew only that he suffered from general back pains, not that a specific incident caused them. Anchor House has no contemporary record of the toolbox incident, denies any contemporary knowledge of the injury, and implies that Cogger retrospectively exaggerates the severity of his "self-report[ed] ... alleged injury."

On July 13, 1992, while he was on a fishing trip without his medication, the pain in Cogger's back became much worse. Anchor House suggests that this newly increased back pain may have been a result of the 1989 injury, or a result of Cogger's catching a

fifteen to twenty-pound king salmon on the fishing trip. On July 15, Cogger went to a hospital emergency room for his back pain. When asked about the cause of his pain, Cogger did not specifically mention the toolbox incident to his physicians, Dr. Edney and Dr. Cates. He "[d]enied any specific instance of the onset of the pain," but he did report "a history of low back pain for the last three months." At some point in August, Cogger's wife, Karen Cogger, told Murray Colgin, Cogger's supervisor, that his injury was work-related.[2] After continuing medical treatment and a course of limited therapy, including a week off from work (at the doctor's recommendation), prescription painkillers and a muscle relaxant, Cogger's back pain worsened and spread to his buttocks and legs, and he began to have bowel and bladder problems. On August 19, doctors ordered a magnetic resonance image (MRI) test and learned from it that Cogger had a herniated disk. Surgery on August 21, one week of hospitalization, and a month off from work followed.

On September 9, 1992, Cogger filed a workers' compensation claim for his April injury, claiming that the toolbox incident had caused his herniated disk. Anchor House disputed Cogger's claim. After a hearing, the Alaska Workers' Compensation Board (the Board) determined that Cogger's claim was barred because AS 23.30.100 requires notice of workers' compensation claims within thirty days of when the injury becomes discoverable, and Cogger had waited for more than thirty days, from July 13 until September 9, to submit formal notice. The superior court affirmed the Board's ruling.

Cogger appeals to this court. He asserts that (1) he formally reported the injury within the thirty-day limitation period because that period began to run on August 20, 1992, (2) even if his employer lacked timely formal notice, it had timely actual notice because Cogger's supervisors knew of his injury and any failure to give timely formal notice was not prejudicial, and (3) otherwise, the law's catch-all excuse for failure to give notice should apply.

---

2. Precisely when this conversation took place is discussed in Part III.D. *infra*.

## III. DISCUSSION

### A. Standard of Review

■ Cogger's appeal raises questions of both fact and law. This court reviews administrative findings of fact under the standard of whether they "are supported by substantial evidence in light of the whole record." *Delaney v. Alaska Airlines*, 693 P.2d 859, 863 (Alaska 1985), *overruled on other grounds, Wade v. Anchorage Sch. Dist.*, 741 P.2d 634, 638–39 (Alaska 1987). This court reviews administrative findings of law that raise questions of statutory construction and do not implicate agency expertise using its independent judgment. *Phillips v. Houston Contracting, Inc.*, 732 P.2d 544, 546 (Alaska 1987).

### B. Whether Cogger Gave His Employer Timely Formal Notice

■ An employee must provide formal written notice to his or her employer within thirty days of an injury in order to be eligible for workers' compensation. AS 23.30.100.[3] For reasons of fairness and based on the general excuse in AS 23.30.100(d)(2), this court has read a "reasonableness" standard, analogous to the "discovery rule" for statutes of limitations, into the statute. *Alaska State Hous. Auth. v. Sullivan*, 518 P.2d 759, 761 (Alaska 1974). Under this standard, the thirty-day period begins when "by reasonable care and diligence it is discoverable and apparent that a compensable injury has been sustained." *Id.* at 761 (quoting 3 Arthur Larson, *Workmen's Compensation* § 78.41, at 60 (1971)).

■ Cogger suggests that the thirty-day period begins to run when the full seriousness of the injury becomes evident, in his case on the date of the August MRI diagnosis. Alternatively, Cogger asserts that the

thirty days begin when "compensation is payable." Under this rule, he claims that the thirty-day period began on July 15, 1992, when he first sought medical treatment, or on July 16, when he first took time off work.

■ Under *Sullivan*, the thirty-day period begins to run when the worker could reasonably discover an injury's compensability. 518 P.2d at 761. The exact date when an employee could reasonably discover compensability is often difficult to determine, and missing the short thirty-day limitation period bars a claim absolutely. For reasons of clarity and fairness, we hold that the thirty-day period can begin no earlier than when a compensable event first occurs. However, it is not necessary that a claimant fully diagnose his or her injury for the thirty-day period to begin.

The Board found that the thirty-day limitation period started on July 13, 1992, because on that date Cogger "knew he had a serious back problem." We reject this conclusion. Cogger's injury became compensable on July 15, 1992, when he visited the emergency room and incurred medical costs for this emergency room visit. Because the thirty-day limitation period begins, at the earliest, when a compensable event occurs, the thirty days began to run on July 15, 1992. Because Cogger waited until September 9, 1992 to file formal written notice, the Board and the court were correct to hold that his formal notice was untimely.

### C. Whether Anchor House Had Knowledge

Cogger claims that his failure to provide timely formal notice is excused, as allowed by law, because Anchor House had knowledge and did not suffer prejudice. AS 23.30.100(d)(1).[4] We consider three of Cog-

---

**3.** AS 23.30.100 states in pertinent part:

(a) Notice of an injury or death in respect to which compensation is payable under this chapter shall be given within 30 days after the date of such injury or death to the board and to the employer.

(b) The notice must be in writing, contain the name and address of the employee and a statement of the time, place, nature, and cause of the injury or death, and be signed by the

employee or by a person on behalf of the employee....

**4.** AS 23.30.100(d) states in part:

Failure to give notice does not bar a claim under this chapter

(1) if the employer, an agent of the employer in charge of the business in the place where the injury occurred, or the carrier had knowledge of the injury or death and the board determines that the employer or carrier has

ger's theories as to how Anchor House had knowledge.

### 1. *What Cogger told co-workers about the toolbox incident*

■ Cogger argues that Anchor House had actual notice because he told co-workers about the toolbox incident. At his Board hearing, Cogger testified that he reported the toolbox incident to his supervisor, Murray Colgin. However, Cogger's own deposition, as well as Colgin's testimony, contradict this statement.

Most other witness contradicted Cogger's statement that he told "just about everyone" at work that he hurt his back carrying the toolbox up the stairs. Co-workers Loreen Fidler, Cliff Parker, Jacqueline Wingfield and Mike Arlint, as well as Colgin, testified that Cogger never told them that he injured his back in the toolbox incident. Cogger did tell two co-workers, Fidler and Candace Bonham, that his back hurt from carrying the toolbox, but not about the specific April 1992 incident. On an earlier questionnaire, Bonham had attributed Cogger's back problems to the fact that, "[p]art of Tony's job involved heavy lifting of milk crates [and] groceries."

The Board found Cogger's testimony that he had informed co-workers about the toolbox incident to be inconsistent with other testimony, self-serving, and not credible. This finding is supported by substantial evidence, and we therefore affirm it.

### 2. *What Cogger told Bonham and Parker*

■ Cogger also asserts that two "apparent supervisors," Bonham and Parker, were aware of his injury. Bonham and Parker both indicated that Cogger told them of his injury (and that it was work-related). This fact would prove that the employer had actual notice, if informing Bonham and Parker suffices to give notice to Anchor House.

■ Both Cogger (although he equivocates) and the Board cite to Professor Larson for the rule that informing a co-worker who is not a supervisor does not satisfy the statutory requirement of providing knowledge to "the employer." We agree, and hold

not been prejudiced by failure to give no-

that for purposes of giving actual notice under AS 23.30.100(d)(1) the employee does not give notice to the employer when he or she informs a non-supervisory co-worker.

The parties dispute whether Bonham and Parker were Cogger's supervisors. Parker described his responsibility as "sort of management, janitorial, security," and Bonham considered herself in charge of Cogger. However, Wingfield, the administrator of Anchor House, said that nobody other than herself and Colgin had supervisory authority over Cogger. The Board concluded that Colgin and Wingfield were "the employer's agents in charge on the premises," and thus Cogger's only supervisors. This factual finding is supported by substantial evidence. Accordingly, we affirm the Board's conclusion that Bonham and Parker were not supervisors. Cogger's statements to Bonham and Parker therefore did not suffice to notify Anchor House.

### 3. *Knowledge admitted by Colgin*

■ Cogger asserts that as a matter of law, knowledge is proven because his supervisor Murray Colgin admitted that he knew three things: that Cogger had back problems, that those problems bothered Cogger during some of his work duties, and that in July Cogger sought medical treatment for the problems. Relying on this court's decision in *State v. Moore*, 706 P.2d 311, 312 (Alaska 1985), Cogger claims that a "reasonably conscientious supervisor" should have realized from these facts that Cogger might have a potential workers' compensation claim.

■ The workers' compensation statute excuses an employee's failure to give formal written notice where the employer has "knowledge of the injury." AS 23.30.100(d)(1). We have today, in the case of *Kolkman v. Greens Creek Mining Co.*, disapproved the additional requirement which sprang from *State v. Moore*, 706 P.2d 311 (Alaska 1985), that the employer have knowledge of the work-relatedness of the injury. We held that the statute should be

tice. . . .

read literally to require the employer's knowledge of the injury, and no more.[5] While the question whether Anchor House had knowledge of the work-relatedness of Cogger's injury is close, there is no question that Anchor House had knowledge of Cogger's injury.

Cogger's supervisors at Anchor House knew that Cogger had a back condition. They knew that it deteriorated in July 1992 to the point that he had to seek medical treatment and miss a week of work. They knew that several requirements of his job, specifically the lifting associated with milk runs, Costco runs, and patient lifting potentially strained his back. Anchor House knew of Cogger's injury. Cogger's employer had sufficient actual knowledge of Cogger's injury to trigger the protections of the statute.

Because Anchor House had knowledge of the injury, we turn to the question whether Anchor House was prejudiced by any delay in obtaining knowledge.

### D. *Whether Anchor House Was Prejudiced by Cogger's Failure to Give Timely Formal Notice*

Actual knowledge can serve as a substitute for formal written notice only where the employer "has not been prejudiced" by the failure to provide formal notice. AS 23.30.100(d)(1). We first analyze whether the employer's actual knowledge was so untimely as to be prejudicial. We conclude that under either of the ways in which the employer had actual knowledge of the injury, that knowledge was not so untimely as to be prejudicial.

On the basis that Colgin knew of Cogger's back problems and their aggravation caused by his lifting responsibilities, Colgin had such knowledge by July 16, 1992. This falls well within even the thirty-day limitation period for timely formal notice, so there was no prejudicial delay.

On the basis that Karen Cogger told Colgin that Cogger's back injury was work-related, it is necessary first to determine when the conversation took place. Colgin's testimony was vague, and contradictory, about the exact date that he learned this. Colgin said that Karen Cogger made this statement "close to the time that he started seeking treatment for some relief" (i.e., presumably in mid-July), "[v]ery shortly after the surgery" (i.e., just after August 21), and "right at the time of the scheduled surgery, ... I'd say within five days" (i.e., between August 16 and 26).

The Board concluded that Karen told Colgin on or after August 16, 1992. Substantial evidence supports this finding, although the same evidence indicates that it occurred by August 26 at the latest, so Colgin learned from Karen that Cogger claimed a work-related back injury sometime between August 16–26. This time falls slightly after the thirty-day limitation period for formal written notice, which we find to have started on July 15 and thus to have ended on August 14. However, we cannot agree with the Board that Anchor House was prejudiced in any way by a delay of two to twelve days occurring four months after the alleged toolbox incident.

The Board found the lack of formal notice prejudicial to Anchor House for two reasons: immediate reporting of Cogger's alleged mid-April back injury might have allowed treatment that prevented any later aggravation, and the reporting delay hampered investigation of the incident. *See Tinker v. Veco, Inc.*, 913 P.2d 488, 492 (Alaska 1996). Cogger argues that the Board erred in this analysis.

Cogger is correct that Anchor House suffered no prejudice in terms of his treatment. Before July, Cogger's alleged April injury was not compensable, and he did not need to report it. After his back pain worsened on the July fishing trip, Cogger's employer could have done little more than Cogger did to alleviate it. The record gives no indication that Cogger received insufficient medical care once he decided that his injury warranted treatment.

---

5. *Moore* inferred from AS 23.30.100(d)(1) a requirement that, in order for the employee to be accorded the protections of the statute, the employer must have been aware of the work-relatedness of the injury. 706 P.2d at 312.

Cogger is also correct that the delay in notification was not prejudicial in terms of hampering the employer's investigation. We have held that where an employer has knowledge equivalent to a legally sufficient formal written claim, "it would require an exceptional set of circumstances for this difference in the form by which the information was conveyed to prejudice the employer." *Id.* Anchor House had knowledge of all the information that a formal written claim would have contained *except* that Cogger believed the toolbox incident to be the precipitating factor, and it learned that on September 9. The delay in furnishing this information (from two to twelve days) could not have been prejudicial in terms of investigating an incident which occurred four months before and to which there were no eyewitnesses besides the employee.

E. *Whether Cogger's Failure to Provide Notice Is Excused for Any Other Reason*

Cogger argues that what he calls the "catch-all" excuse for failure to provide notice in AS 23.30.100(d)(2),[6] and public policy arguments, excuse his failure to provide timely formal notice. As we find that Anchor House had actual knowledge and was not prejudiced, we need not reach these arguments.

IV. *CONCLUSION*

The Board and the lower court correctly found that Cogger did not give Anchor House timely formal notice. The thirty-day limitation period began to run on July 15, 1992, and Cogger did not give formal notice until September 9. Cogger's failure to provide timely formal notice is excused, however, because Anchor House had actual knowledge and his failure was not prejudicial. We therefore REVERSE the judgment of the superior court. We REMAND to the court for remand to the Board with instructions to

6. The statute provides:
   Failure to give notice does not bar a claim under this chapter
   . . .

consider whether Cogger's claim is compensable.

(2) if the board excuses the failure on the ground that for some satisfactory reason notice could not be given[.]