*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| GE VUE, | ) |
| | ) Supreme Court No. S-17469 |
| Appellant, | ) |
| | ) Alaska Workers' Compensation |
| v. | ) Appeals Commission No. 18-006 |
| | ) |
| WALMART ASSOCIATES, INC. and | ) O P I N I O N |
| NEW HAMPSHIRE INSURANCE | ) |
| COMPANY, | ) No. 7490 – November 6, 2020 |
| | ) |
| Appellees. | ) |
| | ) |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: James C. Croft, The Croft Law Office, LLC, Anchorage, for Appellant. Vicki Paddock, Meshke Paddock & Budzinski, P.C., Anchorage, for Appellees.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

STOWERS, Justice.

## I.     INTRODUCTION

An asset-protection worker was shot in the face with a pellet gun while working at a retail establishment. A pellet lodged near the optic nerve of his right eye and could not be surgically removed. The worker also received treatment for post-traumatic stress disorder (PTSD) and pain. The employer contended that he was not

disabled by the psychological injury and, after an ophthalmologist retained by the employer questioned specific pain-related medical care, the employer controverted that treatment. The Alaska Workers' Compensation Board granted the worker's claim for medical care, found the employer had not unfairly or frivolously controverted benefits, and denied the worker's request for disability during periods of time when his eye doctors said he had the physical capacity to perform asset-protection work. The Alaska Workers' Compensation Appeals Commission affirmed the Board's decision. The worker appeals, making arguments related to disability and the standard for finding an unfair or frivolous controversion. We reverse the Commission's decision and remand with instructions to remand to the Board for calculation of benefits and penalty owed to the worker.

## II.    FACTS AND PROCEEDINGS

Ge Vue was an asset-protection worker at the Walmart in Eagle River in 2016. On February 3, he was shot in the back and face with a pellet gun when he and another asset-protection worker tried to stop three juveniles from taking a cart full of merchandise they had not paid for. No pellets penetrated his back, but one pellet penetrated the skin near his right eye and came to rest in his right orbit, or eye socket,[1] near his optic nerve.

Vue went to the emergency room that night and saw Dr. Carl Rosen, an Anchorage ophthalmologist, the next day. Dr. Rosen recommended surgery as soon as possible, and Vue underwent surgery on February 5. Doctors were unable to remove the pellet because of  the risk of "jeopardizing the patient's vision."  Dr. Rosen recommended that Vue wait to see if the pellet would migrate to a position that would allow for easier removal.

---

[1]      *Orbit*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

Walmart terminated Vue's employment on February 19. A later medical report indicates Vue was fired "because he made the apprehension of the suspects outside in the parking lot." Walmart paid Vue temporary total disability (TTD) benefits after it fired him.

Vue told Dr. Rosen in March that he was "having a hard time managing the pain in his head," which was waking him up at night. The injury affected Vue's sight in his right eye: he had a small scotoma,[2] decreased visual acuity, "trouble with color perception," and binocular diplopia[3] "in extreme gazes." Dr. Rosen prescribed eyeglasses — Vue had not worn them before — and told Vue the pellet might "eventually cause compression on the optic nerve." At that time Vue indicated he was "considering therapy for mental distress" and would ask his primary doctor for a referral.

In April a physician assistant at another clinic diagnosed Vue with "[p]ost-traumatic stress disorder, acute," noting that Vue had been "dealing with PTSD like symptoms since the assault," and began a referral for counseling. Vue asked about a pain-management doctor because Dr. Rosen did not "want to maintain any kind of pain management."

Vue began to see a counselor, Darcy Logan. Logan's notes indicate that Vue's "[d]isturbance cause[d] clinically significant distress/impairment in social and occupations functioning," with an onset within a week of the assault. The notes reflect difficulties Vue was having in terms of pain, fear, and depression.

---

[2] A scotoma is an area in the visual field where "vision is absent or depressed." *Scotoma*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[3] Binocular diplopia is a type of double vision that "suggests disconjugate alignment of the eyes." THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 550-51 (Robert S. Porter, ed., 19th ed. 2011).

Vue went to the emergency room because of his pain on April 14 and had another CT scan. Dr. Rosen thought this scan showed the pellet had "slightly migrated up" and referred Vue to Dr. Shu-Hong Chang in Seattle. On April 20, Dr. Rosen told Walmart that Vue had the physical capacities to return to his job in asset protection. Walmart stopped paying TTD as of that date, but did not formally controvert TTD at that time.

Vue saw Dr. Chang in May; she reviewed the imaging studies, said the April scan showed "more impingement on [the] optic nerve," and recommended that Vue consult a pain specialist because she thought there was "a neuropathic component" to Vue's pain. Dr. Chang advised there was a 50% risk of blindness from a second surgery as well as a 50% chance of persistent pain even if the pellet were removed. After Vue returned to Alaska, Dr. Rosen referred him to Dr. Heath McAnally of Northern Anesthesia & Pain Medicine for pain management.

Vue continued to see Logan for mental health counseling and went to Northern Anesthesia for pain treatment. A physician assistant at Northern Anesthesia prescribed gabapentin for neuropathic pain.[4] Vue returned to see Dr. Rosen in June, telling Dr. Rosen he was not able to work; "[a]fter a lengthy discussion and consideration" Vue decided to try another surgery to remove the pellet and Dr. Rosen agreed. Dr. Rosen sent another referral to Dr. Chang.

In August Walmart scheduled an employer's medical evaluation (EME) with an ophthalmologist, Dr. William Baer, and a psychologist, Dr. Donna Wicher. Dr. Baer identified "pain and diminished visual acuity in [Vue's] right eye, as well as his binocular diplopia" as causes of his disability. Dr. Baer wrote, "There also appear to be

---

[4]    According to medical testimony, neuropathic pain, or neuralgia, results when a nerve is injured; the nerve sends pain signals in the absence of "a defined stimulus."

psychological issues, which are beyond the scope of ophthalmologic review." In Dr. Baer's opinion, the shooting "and its sequelae are the substantial cause of Mr. Vue's disability and need for treatment." Dr. Wicher diagnosed Vue with "Adjustment Disorder with Mixed Anxiety and Depressed Mood" and said Vue's employment had been the substantial cause of his "current and ongoing disability and need for medical treatment since the time of the injury."

Vue had a second surgery to remove the pellet in late August; Walmart began to pay TTD again as of the surgery date. The second surgery was unsuccessful because the pellet was "intimately attached" to surrounding tissue. Vue continued his treatment with Northern Anesthesia, but he changed counselors after Logan and Dr. McAnally recommended that he try a different therapy for his PTSD — eye movement desensitization and reprocessing therapy (EMDR). Vue began mental health treatment at Providence Alaska Mat-Su Behavioral Health, where his counselor recommended medication as well as counseling. Dr. McAnally suggested Vue try Lyrica for neuropathic pain because of gabapentin's side effects.

In January 2017 Vue returned to Seattle for follow-up. Dr. Chang said on January 5 that Vue was medically stable from a "surgical aspect" but he "need[ed] assistance [with] vision management." Dr. Courtney Francis tested Vue and prescribed glasses; she found no evidence of optic neuropathy. Dr. Francis signed a return to work form on January 5, saying that Vue could return to work with no restrictions the following day even though the form had several restrictions checked. Walmart again ceased paying TTD.

Vue continued with mental health counseling and pain treatment, and Walmart arranged another EME with Dr. Baer and Dr. Wicher. In February Dr. Baer said that Vue was medically stable with respect to his eye but any opinion about Vue's mental health status was "beyond the scope of ophthalmologic examination." When

asked about Vue's prescriptions for three medications, Dr. Baer wrote, "These medications and their use fall outside the scope of ophthalmologic practice. I do not feel competent to remark on their utility or appropriate use . . . ."

Dr. Wicher again diagnosed Vue with adjustment disorder; she added a chronic pain diagnosis and suggested the possibility of somatic symptom disorder.[5] She did not think Vue was medically stable "with regards to his Adjustment Disorder." Dr. Wicher said the mental health treatment Vue had received was reasonable and necessary and endorsed further psychological treatment. Walmart asked Dr. Wicher whether she would impose physical restrictions on Vue "due to his diagnosed conditions," and Dr. Wicher replied, "Physical restrictions are beyond the scope of this examination. Please refer to Dr. Baer's report for any recommendations of a physical nature." Walmart also asked Dr. Wicher about Vue's future physical capacities, and she responded that Vue's "physical capacities would need to be addressed by a physician." Walmart did not ask Dr. Wicher whether Vue could return to work or if he was disabled by his psychological condition. Dr. Wicher refused to comment on Vue's prescription medications.

Vue continued to receive mental health counseling and medication management. Vue began to plan to move out of state in part because he reported that seeing former coworkers and one of the assailants triggered his PTSD symptoms. Vue stated that he continued to have difficulty going into stores and moving about in public.

Walmart sent follow-up questions to Dr. Baer regarding the medications he considered outside the scope of his practice. It also asked Dr. Baer about the

---

   **5**    Somatic symptom disorders are characterized by "the prominence of somatic [i.e. physical] symptoms associated with significant distress and impairment." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 309 (5th ed. 2013) [hereinafter DSM-5]. The disorder Dr. Wicher indicated should be ruled out, which has DSM code 300.82, is used when the patient's symptoms "do not meet the full criteria" for other disorders in this category. *Id.* at 327.

reasonableness of "pulsed neuromodulation," a treatment Dr. McAnally recommended for pain. According to an attachment to Dr. Baer's report, pulsed neuromodulation directs short bursts, rather than a continuous flow, of radiofrequency energy to nerve tissue, thus reducing the risk of other tissue damage. Walmart asked Dr. Baer about three medications; only Lyrica, which Dr. McAnally prescribed for pain, is at issue on appeal.

Dr. Baer was skeptical about the amount of pain Vue experienced. In Dr. Baer's opinion, the pellet should not continue to cause pain, so he concluded that the Lyrica prescription was not reasonable or necessary. With respect to pulsed neuromodulation, Dr. Baer said it was "not widely accepted as a treatment modality" and suggested the question "also could be referred to a physician experienced in pain management" because "[m]edical literature suggests that it may be useful in certain cases." Dr. Baer observed that Dr. McAnally "performed a temporary nerve block with reported relief of symptoms"; Dr. Baer noted the availability of "accepted treatment modalities for longer term or permanent block." Dr. Baer did "not support" pulsed neuromodulation. Because the need for the treatment depended on Vue's pain level, which Dr. Baer questioned, Dr. Baer opined that the work-related injury was not the substantial cause of any need for pulsed neuromodulation. Dr. Baer attached to his report a printout from an insurance website and an article from a medical journal, both about pulsed radiofrequency. Walmart controverted Lyrica and pulsed neuromodulation.

Dr. McAnally responded to Dr. Baer's report. Dr. McAnally considered the source of Vue's pain to be the infraorbital nerve, a "branch of the maxillary division of the trigeminal nerve" near the eyelid, not the pellet. Dr. McAnally wrote that Vue's "response to infraorbital nerve block [was] sufficient corroboration" for this diagnosis, calling a nerve block "the gold standard in terms of diagnosing these peripheral neuralgias." After pointing out that Dr. Baer had no expertise in "interventional pain

management," Dr. McAnally declared that the controversion of Lyrica was "unconscionable."

Vue, through an attorney, filed a written workers' compensation claim for several benefits, including TTD from April 2016 until medical stability, "medical and psychological treatment," and penalty. Walmart answered, admitting two discrete periods of TTD and some medical benefits. Walmart filed another controversion, this one controverting TTD from April 20 to August 24, 2016, and after January 7, 2017; it also controverted medical benefits "which are unnecessary, unreasonable and/or unrelated to employee's injury."

In June Vue moved with his family to Wisconsin, where he found a job at an auto parts store the following month. Vue testified at his deposition about his salary there and described how his employer accommodated his continuing PTSD symptoms. Vue said "mov[ing] away from triggers" had improved his psychological status but that he still used EMDR at times to calm himself. Vue testified about difficulties he had in getting prescription refills.

Dr. Baer discussed his opinions about the use of Lyrica and pulsed neuromodulation at his deposition. Dr. Baer testified that in his judgment Lyrica was unnecessary because he did not think the pellet should cause constant pain; he ended his explanation by saying, "It's a judgment call." Dr. Baer indicated that long-term treatment of pain was "outside [his] experience" and that use of Lyrica for "constant, unremitting pain" was "beyond [his] knowledge." He testified he had never prescribed any of the medications Walmart asked him about.

With respect to pulsed neuromodulation, Dr. Baer said that he "[h]ad to look it up" when Walmart first inquired. When asked whether he had found any studies about treating infraorbital neuralgias with pulsed neuromodulation, Dr. Baer indicated he did not pursue the issue "that much." He testified he had called two colleagues who

specialized in "oculoplastic surgery" to discuss the treatment. Dr. Baer stated he did not have enough experience to comment on Dr. McAnally's opinion about the cause of Vue's neuropathic pain.

The Board held a hearing on Vue's claim in March 2018. Vue argued that the presumption analysis applied to his claim related to his psychological condition because it arose from his physical injury.[6] He contended he had attached the presumption of compensability and that Walmart had not rebutted it. He also argued that both controversions were frivolous and unfair. Vue's attorney acknowledged that Vue was working and thus was no longer totally disabled. Walmart argued that Vue was not disabled by his psychological condition, saying that none of Vue's healthcare providers had imposed mental-health-related work restrictions during the periods it had not paid TTD. Walmart maintained the controversions were supported by substantial evidence so that no penalty was due.

Vue testified about continuing problems he had with PTSD symptoms and explained how his employer accommodated them. He continued to practice EMDR on his own and found it helpful. He had restarted mental health treatment in Wisconsin shortly before the hearing and testified the provider there had prescribed some of the medications he used in Alaska. He said he had been able to get prescriptions filled after his deposition but had problems refilling the prescriptions before the deposition.

Dr. McAnally testified about his treatment of Vue and discussed the uses of Lyrica and pulsed neuromodulation. Dr. McAnally thought Vue's chronic pain was "probably attributable primarily to the initial insult of the projectile," not the retained pellet, and described how Lyrica helps control neuropathic pain. He testified that there

---

[6]    *See Kelly v. State, Dep't of Corr.*, 218 P.3d 291, 298 (Alaska 2009) (describing classifications of mental injury in workers' compensation).

is a strong association ("not causality, of course") between PTSD and chronic pain, calling them "intertwined." As he put it, "People who suffer from [PTSD] are, by definition, hypervigilant. They pay more attention to pain signals and messages." He said PTSD and chronic pain needed to be addressed together to "make any headway." Dr. McAnally discussed pulsed neuromodulation and affirmed that he had administered the treatment to Vue at no charge.

The Board decided Vue was entitled to Lyrica and pulsed neuromodulation but not to additional TTD or a penalty. It also found that Walmart had not frivolously or unfairly controverted benefits. As to the TTD, the Board decided that Vue had attached the presumption with a letter from Dr. McAnally stating Vue's eye pain limited his ability to perform some job duties. The Board said Vue also "raise[d] the presumption with his testimony" related to "anxiety and paranoia."[7]

Considering evidence to rebut the presumption, the Board said that in 2016 Dr. Rosen indicated Vue "had the physical capacities to return to work" at his Walmart job. The Board noted that Walmart had resumed TTD at the time of the second eye surgery and paid it through the date Dr. Francis released Vue to work. The Board observed that Dr. Wicher said Vue was not medically stable with respect to his mental injury, although she did not say whether he could return to work. The Board decided Dr. Baer's and Dr. Francis's ophthalmologic opinions in 2017 about Vue's eye condition were "substantial evidence adequate to support the conclusion [Vue] could return to work without restrictions," even though it acknowledged that "Dr. Baer stated it was not appropriate for him to consider the stability of [Vue's] mental condition."

---

[7] Vue used the term "paranoia" in his testimony; medical reports used "hypervigilance."

After weighing the evidence, the Board decided Vue had not carried his burden of proof. It denied the TTD claim because Vue had returned to work full time and because he had not produced "reliable evidence of loss of earning capacity." The Board did not separately discuss the two time periods when Walmart did not pay TTD.

The Board decided that Lyrica and pulsed neuromodulation were reasonable and necessary medical treatments. It determined Walmart had not produced adequate evidence to rebut the presumption related to Lyrica. The Board decided that Walmart had rebutted the presumption with respect to pulsed neuromodulation and decided Vue had proved his claim.

Turning to the controversion issue, the Board found Dr. Baer's opinions about Lyrica and pulsed neuromodulation were adequate evidence to support the first controversion. It thought that the second controversion was sufficiently specific and that the evidence related to medical stability was adequate to support the controversion of TTD.

Vue appealed to the Commission, which affirmed the Board's decision; Walmart did not file a cross-appeal. On appeal, Walmart argued that expert medical testimony is always needed to attach the presumption in a case with a "psychiatric" diagnosis. The Commission did not address this argument. The Commission summarized medical evidence related to Vue's mental health treatment and wrote, "The Board found Mr. Vue's own testimony about his fear of returning to work, supported by Dr. McAnally's testimony, was sufficient to raise the presumption that his disability was due to work injury and he was entitled to TTD." While the Commission did not explicitly affirm the Board's decision about attaching the presumption, it implicitly did so when it analyzed the rebuttal stage.

The Commission said that to rebut the presumption Walmart "needed to produce medical evidence demonstrating that the work injury was not the substantial

-11- **7490**

cause of his inability to work." Walmart had argued that it rebutted the presumption through "the complete absence of professional opinion that Mr. Vue was totally disabled from a psychological condition." The Commission, however, wrote that Walmart relied on Dr. Baer's and Dr. Wicher's reports to rebut the presumption. The Commission summarized Dr. Baer's opinion from his 2017 reports about medical stability and medical treatment. It then said, "Dr. Wicher deferred to Dr. Baer on the question of Mr. Vue's ability to return to work even though he was not medically stable mentally." The Commission decided Walmart had rebutted the presumption, and like the Board, the Commission did not break the TTD into separate time periods.

Reviewing the Board's evaluation of the evidence, the Commission said medical reports could permit an inference that Vue was unable to work because of his mental problems, but "none of the doctors stated he was unable to work or to work only with restrictions, due to his mental condition." The Commission noted that the ophthalmologists "did not address the mental issues arising from this tragedy" but inferred that Dr. Wicher indicated that Vue "was not sufficiently debilitated that he could not return to work." The Commission affirmed the Board's TTD decision.

The Commission relied only on *Harp v. ARCO Alaska, Inc.*[8] and one of its own decisions when considering the controversion issue. It decided the April controversion was in good faith because Walmart relied on Dr. Baer's opinion. Turning to the second controversion, the Commission said this controversion was based on Dr. Chang's and Dr. Vincent's medical reports. The Commission said that Dr. Wicher "deferred to the ophthalmologists the question of [Vue's] ability to return to work" and that the ophthalmologists had released him to work without restriction. The Commission concluded this controversion was also in good faith.

---

[8]    831 P.2d 352 (Alaska 1992).

Vue appeals.

## III.   STANDARD OF REVIEW

In an appeal from the Commission, we review the Commission's decision and not the Board's.[9] "We apply our independent judgment to questions of law that do not involve agency expertise, including issues of statutory interpretation," and "interpret a statute 'according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose.' "[10] We review de novo the Commission's legal conclusion that substantial evidence supports the Board's factual findings by "independently reviewing the record and the Board's findings."[11] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[12] "Whether the quantum of evidence is substantial is a question of law."[13]

## IV.   DISCUSSION

To frame the discussion that follows, we identify certain legal issues that underlie the administrative decisions, even though the agencies did not explicitly mention them.

---

[9]   *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1121 (Alaska 2017).

[10]   *Vandenberg v. State, Dep't of Health & Soc. Servs.*, 371 P.3d 602, 606 (Alaska 2016) (quoting *Louie v. BP Expl. (Alaska), Inc.*, 327 P.3d 204, 206 (Alaska 2014)).

[11]   *Humphrey v. Lowe's Home Improvement Warehouse, Inc.*, 337 P.3d 1174, 1178 (Alaska 2014) (citing *Shehata v. Salvation Army*, 225 P.3d 1106, 1113 (Alaska 2010)).

[12]   *Id.* at 1179 (quoting *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000)).

[13]   *Id.*

Vue asserts, and Walmart does not contest, that his claim for PTSD-related disability is a physical-mental claim. We have previously discussed the classification of workers' compensation claims related to psychological conditions;[14] in a physical-mental claim a psychological condition arises from a physical injury, and the claim is analyzed using the same presumption analysis used for physical claims[15] rather than the higher standard the legislature imposed on mental claims arising from mental stress.[16] Dr. Wicher's report amply supports the classification Vue advocates: she attributed Vue's mental health condition to the disability and pain he has undergone as a result of the assault. Both the Board and the Commission used the standard presumption analysis, even if they did not identify the type of claim Vue had. We agree that Vue's claim is appropriately categorized as a physical-mental claim to which the presumption analysis applies.

As set out above, Walmart did not contest that Vue suffered a work-related injury to his eye. Vue argues here, as he did before both the Board and the Commission, that he was disabled not only by the eye condition but also by PTSD and that the PTSD-related disability began shortly after the shooting and continues. Walmart contends that Vue was never totally disabled by his mental health condition, but it has not disputed its liability for discrete periods of TTD due to Vue's eye condition and the surgeries related to it. Walmart also does not contest that Vue has a work-related psychological condition; Dr. Wicher's reports confirm that he does. The TTD dispute between the parties is thus whether Vue's psychological condition made him disabled as that term is used in the Alaska Workers Compensation Act (Act).

---

[14] *See Kelly v. State, Dep't of Corr.*, 218 P.3d 291, 298 (Alaska 2009).

[15] *Runstrom v. Alaska Native Med. Ctr.*, 280 P.3d 567, 572-73 (Alaska 2012).

[16] *See* AS 23.30.010(b).

A worker is eligible for TTD for "disability total in character but temporary in quality" until he reaches medical stability.[17] Disability under the Act is not a purely medical concept: "disability" is defined as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment."[18] We have held in this regard that "[t]he primary consideration is not the degree of the worker's physical impairment, but rather the loss of earning capacity related to that impairment."[19] "Once an employee is disabled, the law presumes that the employee's disability continues until the employer produces substantial evidence to the contrary."[20]

"Medical stability" is "the date after which further objectively measurable improvement from the effects of the compensable injury is not reasonably expected to result from additional medical care or treatment."[21] Because medical stability is tied to the effects of the injury, not to a single condition, when a worker has more than one disabling work-related injury or condition, medical stability must encompass both.[22]

---

[17]     AS 23.30.185.

[18]     AS 23.30.395(16).

[19]     *Ketchikan Gateway Borough v. Saling*, 604 P.2d 590, 594 (Alaska 1979), *superseded in part on other grounds by statute as recognized in Morrison v. Alaska Interstate Constr. Inc.*, 440 P.3d 224, 235-36 (Alaska 2019); *see also Vetter v. Alaska Workmen's Comp. Bd.*, 524 P.2d 264, 266 (Alaska 1974).

[20]     *Grove v. Alaska Constr. & Erectors*, 948 P.2d 454, 458 (Alaska 1997).

[21]     AS 23.30.395(28).

[22]     *See Burke v. Houston NANA, L.L.C.*, 222 P.3d 851, 863 (Alaska 2010) (holding that medical report that addressed only one of two disabling conditions did "not constitute substantial evidence to rebut the presumption" that other condition was medically stable); *cf. Unisea, Inc. v. Morales de Lopez*, 435 P.3d 961, 965, 971 (Alaska (continued...)

Neither the Board nor the Commission considered separately the two discrete time periods for which Walmart contested Vue's eligibility for TTD — one in 2016 and one in 2017 — even though both agencies determined that Vue had attached the presumption that he was disabled by his psychological condition. We have considered evidence related to discrete periods of time in reviewing TTD claims.[23] We consider the evidence in detail below, but if Vue attached the presumption that he was disabled by his psychological condition shortly after the 2016 shooting, then the Board and the Commission first needed to consider whether Walmart provided substantial evidence to rebut the presumption in 2016, when it first stopped paying TTD. Substantial evidence to rebut the presumption must be relevant evidence.[24] If no relevant evidence rebutted the presumption as to the 2016 time period, then Vue is entitled to TTD for that time period notwithstanding the possibility that Walmart offered sufficient evidence to rebut the presumption in 2017.

### A. The Commission Correctly Concluded That Vue Attached The Presumption Of Compensability.

Walmart challenges the Board's and the Commission's decisions that Vue attached the presumption of compensability. It argues that he was required to provide a medical opinion that his psychological condition was totally disabling, evidently from

---

**22** (...continued)
2019) (discussing difference in concepts of medical stability and maximum medical improvement when worker has more than one condition).

**23** *See Burke*, 222 P.3d at 862-63 (analyzing evidence related to eight-month period of TTD); *Thoeni v. Consumer Elec. Serv.*, 151 P.3d 1249, 1255-56 (Alaska 2007) (examining evidence related to approximately three-month period of TTD).

**24** *Thoeni*, 151 P.3d at 1253 ("Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Circle De Lumber Co. v. Humphrey*, 130 P.3d 941, 946 (Alaska 2006))).

a healthcare provider with psychological or psychiatric training.[25]  In its brief before us, Walmart contends "a psychosocial condition" is a complex medical condition, apparently as a matter of law, such that medical evidence is always needed to attach the presumption.

Vue responds that his mental health condition — PTSD from being shot in the face — is not a complex medical condition.  He maintains that his testimony was sufficient to attach the presumption because to attach the presumption he only needed some evidence establishing a link between his disability and his employment.  He contends that the record has sufficient medical evidence, including Dr. Wicher's 2016 report, to attach the presumption that he was disabled by his psychological condition and also points to notes from his own providers detailing the severity of his symptoms.

After amendment in 2005, AS 23.30.010(a) requires an employee to "establish a causal link between the employment and the disability or death or the need for medical treatment."  The legislative sponsor of this provision indicated that the statutory language "about attaching and rebutting the presumption was derived from . . . case law, and comments of some committee members indicate they understood the amendment as codifying the standards for attaching and rebutting the presumption."[26]  We thus apply our prior cases in evaluating whether the presumption attached.

---

[25]  Because Walmart did not cross-appeal this issue, we consider it only because it could provide an alternative reason to affirm the Commission's decision.  *See Peterson v. Ek*, 93 P.3d 458, 467 (Alaska 2004) (holding that appellee waived several claims by failing to cross-appeal); *Far N. Sanitation, Inc. v. Alaska Pub. Util. Comm'n*, 825 P.2d 867, 869 n.2 (Alaska 1992) (rejecting argument that appellee needed to raise issue in cross-appeal because we can affirm on any basis appearing in the record).

[26]  *Huit v. Ashwater Burns, Inc.*, 372 P.3d 904, 918 (Alaska 2016) (citing Minutes, H. Free Conference Comm. Hearing on S.B. 130, 24th Leg., 1st Spec. Sess. 1:35–1:50 (May 21, 2005) (statements of Sen. Gene Therriault, Sen. Hollis French, and Rep. Eric Croft, and testimony of Kristin Knudson, Assistant Att'y Gen.).

As set out in *Gillispie v. B & B Foodland*, the "threshold showing [to attach the presumption] is minimal and requires only that the employee offer 'some evidence' that the claim arose out of his or her employment."[27] "For purposes of determining whether the claimant has established the preliminary link, only evidence that tends to establish the link is considered — competing evidence is disregarded."[28] The claimant does not need to present substantial evidence to attach the presumption of compensability.[29]

Whether an employee has provided sufficient evidence to attach the presumption is a question of law that we independently review.[30] While we have held that medical testimony may be needed in some cases to establish a preliminary link for causation,[31] we have never held that a specific type of condition or injury requires

---

[27]     881 P.2d 1106, 1109 (Alaska 1994) (quoting *Robinett v. Enserch Alaska Constr.*, 804 P.2d 725, 728 (Alaska 1990)).

[28]     *McGahuey v. Whitestone Logging, Inc.*, 262 P.3d 613, 620 (Alaska 2011) (quoting *Tolbert v. Alascom, Inc.*, 973 P.2d 603, 610 (Alaska 1999)).

[29]     *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000).

[30]     *Tinker v. Veco, Inc.*, 913 P.2d 488, 493 (Alaska 1996); *see also Robinett*, 804 P.2d at 728 (holding that worker provided sufficient evidence to attach presumption through testimony of coworkers and their observations of his condition).

[31]     *See, e.g.*, *Commercial Union Cos. v. Smallwood*, 550 P.2d 1261, 1267 (Alaska 1976); *see also Burgess Constr. Co. v. Smallwood*, 623 P.2d 312, 316 (Alaska 1981) (clarifying need for medical evidence). The cases the parties discuss that required medical testimony to attach the presumption involved preexisting conditions. *See Tinker*, 913 P.2d at 490 (noting preexisting diabetes and Charcot osteoarthropathy); *Delaney v. Alaska Airlines, Inc.*, 693 P.2d 859, 861 (Alaska 1985) (describing claim involving Crohn's disease); *Commercial Union Cos.*, 550 P.2d at 1262-63 (summarizing claim involving preexisting hypertension and diabetes). No doctor identified a preexisting condition that was aggravated by the shooting, although Dr. Wicher's 2017 report

(continued...)

-18-                                                                          **7490**

medical evidence as a matter of law to meet the minimal burden to establish the presumption. The Commission asked Walmart at oral argument for a citation to support its assertion that "a disability related to a psychological condition requires a medical opinion to establish that it exists"; Walmart was unable to provide one. Nor have we required medical evidence to establish a presumption that a claimant is disabled.[32] We have listed a claimant's ability to perform his job duties as a fact that may be established through lay testimony.[33] And in *Smith v. University of Alaska, Fairbanks*, we labeled as "incorrect" a legal rule "that lay testimony should be disregarded in complex medical cases."[34] The Board could thus not disregard Vue's testimony about his ability to work.

Walmart argues that a "psychosocial condition" is as a matter of law "a complex medical condition that requires expertise in identifying."[35] Walmart does not define what it means by a "psychosocial condition," nor does it provide a medical or legal rationale for such a rule. It summarizes some of our cases about medical evidence

---

[31]     (...continued) speculated that Vue "may have pre-existing psychological issues" without identifying them.

[32]     *See Resler v. Universal Servs., Inc.*, 778 P.2d 1146, 1148-49 (Alaska 1989) (holding that Board erred in finding that claimant had not attached presumption); *cf. Carlson v. Doyon Universal-Ogden Servs.*, 995 P.2d 224, 227-28 (Alaska 2000) (deciding Board erred in finding that claimant did not attach presumption that she was permanently disabled when Board relied on medical testimony that claimant could perform some work).

[33]     *Veco, Inc. v. Wolfer*, 693 P.2d 865, 870 (Alaska 1985) (listing ability to do one's job as fact that can be established through lay testimony).

[34]     172 P.3d 782, 790 (Alaska 2007).

[35]     At oral argument before us Walmart referred to a "psychological condition" but did not say whether or how a "psychological condition" is different from a "psychosocial condition."

but does not explain how those cases would lead to the legal conclusion it advocates, nor does it explain how expertise in identifying a "psychosocial condition" would be related to establishing a worker's inability to "earn the wages which the employee was receiving at the time of injury."[36] Walmart has not been consistent in its terminology, using the term "psychiatric condition" — which it also did not define — when making this argument to the Commission. Psychosocial and psychiatric conditions do not appear to be coextensive: the most recent version of the Diagnostic and Statistical Manual suggests these two terms identify different conditions.[37] The Commission did not address Walmart's argument. We need not decide the legal issue Walmart raises because we determine that Vue provided the evidence Walmart says is lacking.[38]

---

[36] AS 23.30.395(16).

[37] "DSM-5 has moved to a nonaxial assessment documentation of diagnosis (formerly Axes I, II, and III), with separate notations for important psychosocial and contextual factors (formerly Axis IV) and disability (formerly Axis V)." DSM-5, *supra* note 5, at 16. "[T]he DSM-5 Task Force recommended that DSM-5 should not develop its own classification of psychosocial and environmental problems, but rather use a selected set of . . . codes" from the relevant International Classification of Diseases. *Id.* at 16, 21. Psychosocial problems have V or Z codes, *id.* at 16, and they include things like "[i]nsufficient social insurance or welfare support" or low income (V60.2), "[p]ersonal history of military deployment" (V62.22), and being a crime victim (V62.89). *Id.* at 848, 856, 862.

[38] Even though we do not decide the issue, we have grave concerns about medical testimony related to all "psychosocial conditions" in a causation analysis, even if they are relevant to treatment. Psychosocial conditions include non-medical considerations that may be problematic in the legal context, like poverty, *id.* at 16, 848. Here, for example, Dr. Wicher noted in 2017 that "cultural standards" or "prior, unresolved traumas" could be factors in Vue's case. And Walmart points to Vue's financial situation as a stressor in arguing that factors other than the shooting contributed to Vue's psychological condition. Could consideration of psychosocial factors in determining causation include an employee's history as a child abuse victim? Could the

(continued...)

-20-                                                        7490

Walmart claimed Vue was no longer eligible for TTD as of April 20, 2016, less than three months after he was shot. Vue's claim sought TTD from April 2016 and continuing. The Board decided Vue attached the presumption with Dr. McAnally's letter indicating Vue still had work-related limitations and with Vue's testimony that he could not work because of his psychological condition. The Commission repeated what the Board said, and also summarized medical evidence related to Vue's mental health treatment.

We agree with the Commission's implicit conclusion that Vue attached the presumption that his psychological condition disabled him shortly after the shooting.[39] Not only did Vue testify that he was unable to work because of "constant fear and . . . paranoia," but he also described a continuing need to "shelter" himself. His testimony was corroborated by counseling records the Board had before it, which documented that

---

[38]    (...continued)
Board consider the culture in which the employee was raised to evaluate the work-relatedness of a disability?

We also note that we recently rejected an employee's argument that psychological expertise was needed to rebut the presumption when an employer's physician identified psychosocial factors as the main cause of the employee's back pain. *Weaver v. ASRC Fed. Holding Co.*, 464 P.3d 1242, 1253 (Alaska 2020). Because attaching the presumption requires less evidence than rebutting the presumption, *see* AS 23.30.010(a) (requiring "a demonstration of substantial evidence" to rebut the presumption and a "causal link" to attach it), our holding in *Weaver* suggests that psychological expertise is not needed to attach the presumption.

[39]    We acknowledge Walmart's argument made at oral argument before us that many people are not totally disabled by a psychological condition, as Vue's current employment status demonstrates. But this does not persuade us that all psychological conditions are per se complex medical conditions requiring an expert opinion about disability to attach the presumption. Vue's medical records and Dr. Wicher's reports both suggest that trauma-related conditions can be more problematic closer to the time of the traumatic event.

in May 2016 he experienced "clinically significant distress/impairment in social and occupations functioning." The chart notes from 2016 recorded problems Vue had going out in public, sleeping, and having flashbacks, any of which could affect an employee's ability to work. Additionally, Vue's inability to work and his ongoing pain complaints appear to have prompted Dr. Rosen's endorsement of Vue's decision to have a second surgery. Dr. Rosen's notes document Vue's "pain, stress, and anxiety" and "lengthy discussion and consideration" of the risky surgery.

Finally, we agree with Vue's argument, made before both administrative agencies, that Dr. Wicher's August 2016 report contained evidence to attach the presumption.[40] Walmart asked Dr. Wicher in 2016: "If Mr. Vue's employment is not 'the substantial cause' of his current and ongoing disability or need for treatment, was there any time following the work injury when the employment was 'the substantial cause' of any disability or need for treatment?" Dr. Wicher responded, "Mr. Vue's employment has been the substantial cause of his *current and ongoing disability* and need for treatment *since the time of the injury*." (Emphasis added.) At oral argument before us Walmart contended that this was insufficient evidence to attach the presumption because Dr. Wicher talked about Vue's disability but never talked about his ability to return to work. Because the Act defines "disability" in relation to an

---

[40] Walmart discusses Dr. Wicher's 2017 report, not her 2016 report, in its argument about attaching the presumption. We need not consider Dr. Wicher's 2017 report in determining whether Vue attached the presumption in 2016. "For purposes of determining whether the claimant has established the preliminary link, only evidence that tends to establish the link is considered — competing evidence is disregarded." *McGahuey v. Whitestone Logging, Inc.*, 262 P.3d 613, 620 (Alaska 2011) (quoting *Tolbert v. Alascom, Inc.*, 973 P.2d 603, 610 (Alaska 1999)). And at the first two stages of the presumption analysis, evidence is considered in isolation and is not weighed. *Id.*

employee's ability to work,[41] we cannot see how this distinction undermines Vue's argument. An employee does not have to provide enough evidence to prove his claim in order to attach the presumption; he only needs to provide "some evidence."[42] As we have previously stated, "The purpose of the preliminary link requirement is 'to rule out cases in which [the] claimant can show neither that the injury occurred in the course of employment nor that it arose out of [it].' "[43] Vue provided more than enough evidence through the medical records and his own testimony to attach the presumption that his work-related psychological condition was disabling in 2016, shortly after he was shot.

**B. The Commission Erred In Concluding That Walmart Rebutted The Presumption That Vue Was Disabled.**

After Vue attached the presumption, Walmart was required to provide substantial evidence to rebut it. In *Huit v. Ashwater Burns, Inc.* we considered whether the legislature modified the second stage of the presumption analysis from our case law when it enacted AS 23.30.010(a), but we limited our consideration to claims in which "there was no competing cause" that might have contributed to the disability.[44] We decided in *Huit* that in cases without a competing cause the second stage of the presumption analysis remained unchanged and was governed by our prior cases.[45] One

---

[41] AS 23.30.395(16).

[42] *Robinett v. Enserch Alaska Constr.*, 804 P.2d 725, 728 (Alaska 1990) (quoting *Cheeks v. Wismer & Becker/G.S. Atkinson, J.V.*, 742 P.2d 239, 244 (Alaska 1987)).

[43] *Resler v. Universal Servs., Inc.*, 778 P.2d 1146, 1148 (Alaska 1989) (alterations in original) (quoting *Cheeks*, 742 P.2d at 244).

[44] 372 P.3d 904, 916-19 (Alaska 2016).

[45] *Id.* at 918-19.

aspect of the rebuttal stage is that it shifts the burden of producing evidence to the employer.[46]

Vue contends no preexisting condition contributed to his disability, making *Huit* applicable. Walmart does not directly respond to Vue's argument about *Huit*, although its argument about attaching the presumption asserts that Vue in fact had a preexisting psychological condition. It highlighted Dr. Wicher's statement in her 2017 report that "Vue may have pre-existing psychological issues" related to his rebelliousness as a teenager or "possible . . . prior, unresolved traumas." Dr. Wicher's speculation does not show a competing cause of Vue's disability, so we apply the pre-2005 second-stage presumption analysis because, as in *Huit*, there is no competing cause that might impact the analysis.

Vue argues that Walmart did not rebut the presumption because it did not produce substantial evidence either that his psychological condition was medically stable or that he was no longer disabled by his mental injury. He maintains that the Board erred by using opinions about his eye condition when it found Walmart rebutted the presumption because he was also disabled by his PTSD. He contends that the Commission's conclusion that Walmart rebutted the presumption is based on an inaccurate interpretation of evidence the Board did not rely on to rebut the presumption.

Walmart argues it rebutted the presumption through the 2017 opinions from two ophthalmologists, as the Board decided, or through Dr. Wicher's report, as the Commission determined. Walmart suggests Vue was required to present "verification of a disability from a provider in the form of restrictions" at the rebuttal stage, echoing its argument before the Commission that it rebutted the presumption through "the complete absence of professional opinion that Mr. Vue was totally disabled from a

---

[46]     *Veco, Inc. v. Wolfer*, 693 P.2d 865, 869 (Alaska 1985).

psychological condition." But at the rebuttal stage, after the presumption has attached, the employer — not the employee — has the burden of producing evidence.[47] We thus reject this argument.

Walmart sought to contest that Vue was eligible for TTD, so it needed to present substantial evidence that Vue had reached medical stability with respect to all of his work-related conditions[48] or that he was capable of earning "the wages which [he] was receiving at the time of injury in the same or any other employment."[49] We have said, "Once an employee is disabled, the law presumes that the employee's disability continues until the employer produces substantial evidence to the contrary."[50] "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "[51]

Walmart denied that Vue was totally disabled for two discrete periods of time: from April 20 though August 24, 2016 and after January 7, 2017. Vue began to work again on July 17, 2017, so at the hearing, he told the Board he was no longer totally

---

**47** AS 23.30.010(a) (requiring a "demonstration of substantial evidence"); *Huit*, 372 P.3d at 906-07 (setting out affirmative and negative evidence tests, which require employer to offer evidence that meets tests).

**48** *See* AS 23.30.185, .395(28); *Burke v. Houston NANA, L.L.C.*, 222 P.3d 851, 862-63 (Alaska 2010); *see also Unisea, Inc. v. Morales de Lopez*, 435 P.3d 961, 965, 971 (Alaska 2019) (discussing difference in concepts of medical stability and maximum medical improvement when worker has more than one condition).

**49** AS 23.30.185, .395(16); *Burke*, 222 P.3d at 863 (quoting AS 23.30.395(16)).

**50** *Grove v. Alaska Constr. & Erectors*, 948 P.2d 454, 458 (Alaska 1997) (citing *Bailey v. Litwin Corp.*, 713 P.2d 249, 254 (Alaska 1986)).

**51** *Thoeni v. Consumer Elec. Servs.*, 151 P.3d 1249, 1253 (Alaska 2007) (quoting *Circle De Lumber Co. v. Humphrey*, 130 P.3d 941, 946 (Alaska 2006)).

disabled as of that date. Neither administrative agency discussed the time periods separately, although the Board cited medical evidence from both 2016 and 2017 in its rebuttal analysis. Both agencies cited Dr. Baer's 2017 report as rebuttal evidence but otherwise used different evidence to conclude that Walmart rebutted the presumption. We first consider the Commission's decision.

Walmart needed substantial evidence to rebut the presumption that Vue was disabled by his PTSD in April 2016, when it first ceased paying TTD.[52] Without clarifying which reports it referred to, the Commission wrote that Walmart "relied on the EME reports of Drs. Baer and Wicher" to rebut the presumption. Because the Commission cited Dr. Baer's opinion that Vue was medically stable, we conclude it meant the 2017 reports, although neither 2016 EME report had evidence to rebut the presumption in any event. In their 2016 reports, both doctors said Vue was not then medically stable, and both indicated Vue had an ongoing disability. In contrast in 2017 Dr. Baer said Vue was medically stable with respect to his eye condition at the time of the evaluation, but he explicitly declined to say whether Vue's mental health condition was medically stable. Dr. Baer's 2017 report did not set out any physical restrictions on Vue related to his eye condition. The Commission said that Dr. Wicher "deferred to Dr. Baer on the question of . . . Vue's ability to return to work even though he was not medically stable mentally."

Substantial evidence does not support the Commission's conclusion. Walmart never asked Dr. Wicher to give an opinion about Vue's disability or his ability to return to work in 2017. It asked Dr. Wicher whether she would impose "physical

---

[52]     *See id.* 1255-56 (discussing evidence related to rebutting presumption for discrete period of disability); *see also Burke*, 222 P.3d at 862-63 (discussing evidence related to each condition for discrete period of disability when worker disabled by two conditions).

restrictions" on Vue due to his "diagnosed conditions" and what Vue's future physical capacities would be. Dr. Wicher's only response that specifically named Dr. Baer said, "Physical restrictions are beyond the scope of this examination. Please refer to Dr. Baer's report for any recommendations of a physical nature." A person can be physically capable of performing all of his job duties and still require work restrictions to address his psychological condition.[53] Dr. Baer's opinion about physical restrictions says nothing about Vue's limitations related to his PTSD or about his wage-earning capacity. The rebuttal evidence the Commission cited did not rebut the presumption that Vue continued to be disabled by his PTSD.

We next consider the Board's analysis. The Board cited Dr. Rosen's April 2016 statement that Vue had "the physical capabilities to perform his regular job duties" and two ophthalmologists' opinions that Vue could return to work in 2017 after the second surgery. The Board did not rely on either of Dr. Wicher's reports in its rebuttal analysis, writing that Dr. Wicher's 2017 report "does not state whether [Vue] can return to work." None of the opinions the Board relied on said anything about Vue's PTSD-related disability and thus were not substantial evidence to rebut the presumption that Vue continued to be disabled by his psychological condition.[54]

We are not persuaded by Walmart's argument that it presented adequate rebuttal evidence because Dr. Wicher's 2016 report said the mental and physical conditions were closely related. To the extent Dr. Wicher directly linked medical stability and psychological stability, the Board knew by the time of the hearing that this

---

[53]     *See Runstrom v. Alaska Native Med. Ctr.*, 280 P.3d 567, 570 (Alaska 2012) (noting restriction on work in patient care when worker suffered anxiety after exposure to HIV from patient care).

[54]     *See Burke*, 222 P.3d at 863 (deciding that opinions about spinal condition were inadequate to rebut presumption related to carpal tunnel syndrome).

prediction was wrong and therefore could not rely on that opinion to rebut the presumption.[55] At the time of the 2017 EME, Dr. Baer thought Vue's eye condition was medically stable, but Dr. Wicher said Vue was not medically stable with respect to his psychological condition.

Because Walmart did not offer substantial evidence to rebut the presumption that Vue was disabled by his psychological condition, both agencies erred in so deciding. Based on this conclusion, we need not address whether Vue proved his claim by a preponderance of the evidence.

## C. The Controversions Were Frivolous As A Matter Of Law Under The Commission's Precedent.

Walmart filed two controversions, one related to Lyrica and pulsed neuromodulation and one related to TTD and medical benefits that were "unnecessary, unreasonable, and/or unrelated to employee's injury." The Board and Commission decided the controversions were not unfair or frivolous using the standard from *Harp v. ARCO Alaska, Inc.*: "For a controversion notice to be filed in good faith, the employer must possess sufficient evidence in support of the controversion that, if the claimant does not introduce evidence in opposition to the controversion, the Board would find that the claimant is not entitled to benefits."[56] Vue contends both controversions were frivolous or unfair, which Walmart disputes.

---

[55]    *Cf. id.* at 862 (citing *Thoeni*, 151 P.3d at 1255-56) (holding that prediction of medical stability that Board knew was incorrect at hearing was not substantial evidence that could rebut presumption).

[56]    831 P.2d 352, 358 (Alaska 1992).

The Act "sets up a system in which payments are made without need of Board intervention unless a dispute arises."[57] Under AS 23.30.155, an employer is required to file a notice of controversion if it disputes liability for a benefit; it is subject to a penalty if it pays a benefit late unless it has filed a timely notice of controversion[58] and that controversion was filed in good faith.[59] The Act requires that a controversion notice state "the type of compensation and all grounds on which the right to compensation is controverted.[60] Controversions thus give notice of disputed issues,[61] which an employee can use to evaluate whether to pursue a claim.[62]

Vue contends that the Commission's current legal standards related to controversions deviate from our precedent and argues that the controversions were frivolous or unfair such that Walmart's insurer must be referred to the Division of Insurance under AS 23.30.155(o), which requires the Workers' Compensation Division

---

[57]     *Harris v. M-K Rivers*, 325 P.3d 510, 518 (Alaska 2014).

[58]     AS 23.30.155(d)-(e).

[59]     *Harp*, 831 P.2d at 358.

[60]     AS 23.30.155(a)(5).

[61]     *See Bockness v. Brown Jug, Inc.*, 980 P.2d 462, 468 (Alaska 1999) (observing that controversion notices of specific medical treatment gave employee adequate notice that employer "did not consider them reasonable and necessary"); *Univ. of Alaska Fairbanks v. Hogenson*, AWCAC Dec. No. 074 at 12 n.68 (Feb. 28, 2008), http://labor.state.ak.us/WCcomm/memos-finals/D_074.pdf ("[T]he purpose of a post-claim controversion is *notice* - to notify the claimant what claimed benefits are contested and why." (emphasis in original) (citing *Groom v. State, Dep't of Transp.*, 169 P.3d 626, 635 (Alaska 2007))).

[62]     *Cf. Bailey v. Tex. Instruments, Inc.*, 111 P.3d 321, 325-26 n.10 (Alaska 2005) ("Once an employer controverts a claim, the burden shifts to the employee to prosecute the claim promptly.").

Director to "promptly notify" the Division of Insurance if the Board "determines that the employer's insurer has frivolously or unfairly controverted compensation due under [the Act]."[63] Walmart sets out the Commission's current controversion standards and argues that substantial evidence supported the agencies' decisions.

### 1.    Our precedent

The agencies here used the *Harp* standard to evaluate the controversions. That standard is an objective standard.[64]  *Harp* relied on an earlier decision construing AS 23.30.155, in which we indicated a penalty can be imposed whether the insurer's conduct in controverting is negligent or intentional.[65]  In *Harp* we used the term "bad faith" to describe controversions that were not filed in good faith; we did not require consideration of the employer's motives when we stated there that "the controversion was made in bad faith and was therefore invalid."[66]  *Harp* was related to a 1987 injury, and the disputed controversion was filed before July 1, 1988,[67] the effective date of AS 23.30.155(o).[68]

---

[63]     AS 23.30.155(o), .395(15).

[64]     *See Harris v. M-K Rivers*, 325 P.3d 510, 517 (Alaska 2014) (describing *Harp* standard as "objective").

[65]     *Stafford v. Westchester Fire Ins. Co. of N.Y.*, 526 P.2d 37, 42 (Alaska 1974) ("AS 23.30.155 does not draw a distinction between wilful and negligent failure to make compensation payments, and thus either type of failure should come within its ambit."), *overruled on other grounds by Cooper v. Argonaut Ins. Cos.*, 556 P.2d 525, 525 (Alaska 1976).

[66]     *Harp*, 831 P.2d 352, 359 (Alaska 1992); *see also Harris*, 325 P.3d at 515 (describing Board finding that controversions "were in bad faith").

[67]     *Harp*, 831 P.2d at 353.

[68]     Ch. 79, §§ 29, 52, SLA 1988.

We have not considered whether a controversion that does not meet the *Harp* standard is frivolous or unfair as a matter of law;[69] for the most part we have reviewed controversion controversies as factual matters.[70] The Board, through decision-making, construed "frivolous or unfair" in AS 23.30.155(o) consistently with the *Harp* standard.[71] Before the Commission was created, we considered whether a Board finding that a controversion was frivolous or unfair was a final decision for purposes of appeal.[72] At that time the Board applied the *Harp* standard.[73] We remarked that "the elements of a frivolous or unfair controversion under AS 23.30.155(o)" — the *Harp* standard — were "similar to the unfair claim settlement practice defined in AS 21.36.125(a)(6)."[74] We made no other comment about the Board's practice.

## 2. The Commission's framework

In 2009 the Commission decided the Board's practice of using the *Harp* standard to evaluate frivolousness or unfairness was erroneous and began to modify the

---

[69]     *See Harris*, 325 P.2d at 519 (declining to decide whether a controversion not made in good faith under *Harp* is always frivolous or unfair under AS 23.30.155(o)).

[70]     *See, e.g.*, *Thoeni v. Consumer Elec. Servs.*, 151 P.3d 1249, 1259 (Alaska 2007).

[71]     *See, e.g.*, *Nava-Shepherd v. Fairbanks Mem'l Hosp.*, AWCB Dec. No. 99-0108, at 4 (May 12, 1999) ("We have applied the court's reasoning from *Harp* to our decisions concerning all sections of AS 23.30.155, and held that a controversion not made in good faith is frivolous and unfair for purposes of AS 23.30.155(o).").

[72]     *Crawford & Co. v. Baker-Withrow*, 81 P.3d 982, 985 (Alaska 2003).

[73]     *Baker Withrow v. Crawford & Co.*, AWCB Dec. No. 00-0131 at 6 (July 3, 2000) ("We have applied the Court's reasoning from *Harp*, and held that a controversion not made in good faith is frivolous and unfair for purposes of AS 23.30.155(o).").

[74]     *Crawford & Co.*, 81 P.3d at 985.

analysis of controversions.[75] The Commission currently requires a three-step process to evaluate a controversion.[76] According to Commission decisions, the Board must first consider whether a controversion was filed in good faith under *Harp*.[77] The Commission requires the Board to consider only the evidence in the employer's possession at the time of the controversion.[78] And because the Commission considers the evidentiary standard for a valid controversion analogous to the standard for rebutting the presumption,[79] it has imposed a requirement that the Board consider the evidence supporting the controversion "in isolation, without assessing credibility and drawing all reasonable inferences in favor of the controversion."[80]

If the Board determines that a controversion was not in good faith, the Board must then consider whether the controversion was frivolous or unfair.[81] The Commission has defined these terms, without explanation or citation to authority, as

---

[75]     *See Kinley's Rest. & Bar v. Gurnett*, AWCAC Dec. No. 121 at 12-16 (Nov. 24, 2009), http://labor.state.ak.us/WCcomm/memos-finals/D_121.pdf (questioning Board's "logic" and summarizing Commission decisions about bad faith in different contexts).

[76]     *State, Dep't of Educ. v. Ford*, AWCAC Dec. No. 133 at 21 (Apr. 9, 2010), http://labor.state.ak.us/WCcomm/memos-finals/D_133.pdf; *see also Gurnett*, AWCAC Dec. No. 121 at 16.

[77]     *Ford*, AWCAC Dec. No. 133 at 21.

[78]     *Gurnett*, AWCAC Dec. No. 121 at 17.

[79]     *Municipality of Anchorage v. Monfore*, AWCAC Dec. No. 081 at 19 (June 18, 2008), http://labor.state.ak.us/WCcomm/memos-finals/D_081.pdf (deciding that doctor's opinion to support a controversion "must be sufficient to rebut a presumption of compensability" of disputed issue).

[80]     *Ford*, AWCAC Dec. No. 133 at 21.

[81]     *Id.*

follows: a "frivolous" controversion is one "completely lacking a plausible legal defense or evidence to support a fact-based controversion" and an "unfair" controversion is "dishonest, fraudulent, the product of bias or prejudice."[82] Finally, if the Board decides that a controversion is frivolous or unfair, it must examine the motives of the controversion author to determine whether the controversion was made in bad faith[83] because "[a] frivolous controversion is not necessarily the product of bad faith conduct by the author, as it may be based on an honest, mistaken understanding of fact or law."[84] The Commission decided that AS 23.30.155(o) requires a separate finding of bad faith,[85] even though the statute requires notice to the Division of Insurance "if the [B]oard determines that the employer's insurer has *frivolously or unfairly* controverted compensation due under [the Act]."[86]

Vue challenges only two aspects of the Commission's legal framework, which we consider in turn. Because of the limited challenge here, we apply other aspects of the Commission's analysis to the facts of this case, but we do not adopt the analysis. For example, we apply the Commission's definitions of "frivolous" and "unfair" because the legislature did not define them and the parties did not ask us to review their meaning, providing no briefing on this issue. The Commission did not explain the basis for its definitions, but the Commission's definition of "frivolous" appears similar to the *Harp* standard. And because Vue's arguments are principally related to the evidence Walmart

---

[82] *Gurnett*, AWCAC Dec. No. 121 at 16.

[83] *Id.*; *see also Ford*, AWCAC Dec. No. 133 at 21.

[84] *Ford*, AWCAC Dec. No. 133 at 21 n.99.

[85] *Id.* at 18; *see also Gurnett*, AWCAC Dec. No. 121 at 12-13.

[86] AS 23.30.155(o) (emphasis added).

had to support the controversions, our analysis of the controversions in this case will focus on whether they were frivolous.

We now consider the specific legal challenges Vue has made to the Commission's three-step framework.

### 3. An employer's insurer has a continuing duty to modify or withdraw a controversion when it receives evidence that undermines the controversion's basis.

Vue contends that the Board is not limited to the evidence in the employer's possession at the time of controversion in assessing whether the controversion meets the *Harp* standard because such a rule allows an employer to escape a penalty when it later obtains evidence that undermines the controversion's factual basis. He argues that an employer has a continuing obligation to withdraw a controversion, so that a penalty may be imposed if an employer later acquires evidence that removes the basis for the controversion but does not withdraw the controversion. Walmart asserts that substantial evidence supports the agency decisions. At oral argument before us Walmart insisted that it had no obligation to withdraw the controversions here, but it did acknowledge that hypothetically if a doctor, provided with more information, changed his opinion when an employer asked, the employer would have an obligation to withdraw the controversion.

In *Harp* we considered the evidence the employer possessed at the time of controversion.[87] It is not unreasonable to consider at the outset the evidence the insurer had when it filed the controversion, particularly when an employee's condition is unstable.[88] But we agree with Vue that an insurer has a continuing obligation to consider

---

[87] 831 P.2d 352, 358 (Alaska 1992).

[88] *See Gurnett*, AWCAC Dec. No. 121 at 7-8 (setting out sequence of
(continued...)

new evidence that comes to its attention[89] and to modify or withdraw controversions based on that new evidence or face a possible penalty or referral to the Division of Insurance. A continuing obligation is implicit in the Act and in Commission decisions.[90] To construe the statute otherwise would allow an insurer to act contrary to the provision's purpose: "creat[ing] an incentive for the insurance carrier to timely pay an employee the compensation due."[91] We therefore hold that the employer has a continuing duty to evaluate the evidence supporting a controversion and that it may be subject to a penalty if it fails to modify or withdraw a controversion after receiving evidence that removes the original basis for the controversion.

### 4. The Commission exceeded its authority by adding an element of subjective bad faith to AS 23.30.155(o).

Vue also challenges the Commission's legal rule that the Board must make a finding of subjective bad faith before it can refer an insurer to the Division of Insurance for frivolously or unfairly controverting a benefit, arguing that Walmart's controversion of Lyrica was unfair and thus Walmart's insurer should be referred to the Division of Insurance under AS 23.30.155(o). Walmart responds that it had adequate evidence to support its controversions.

---

[88] (...continued) opinions about employee's ability to return to work).

[89] AS 23.30.095(h) requires parties to file and serve all medical reports in their possession after a claim is filed; the duty is continuing.

[90] *See Gurnett*, AWCAC Dec. No. 121 at 18 (postulating that physician's change of opinion "might remove the basis for continuing to controvert future compensation").

[91] *Childs v. Copper Valley Elec. Ass'n*, 860 P.2d 1184, 1192 (Alaska 1993).

The Act has contained a penalty provision since 1959,[92] but AS 23.30.155(o) was added in 1988.[93] The statutory language is not complex:

> The [D]irector shall promptly notify the [D]ivision of [I]nsurance if the [B]oard determines that the employer's insurer has frivolously or unfairly controverted compensation due under [the Act]. After receiving notice from the [D]irector, the [D]ivision of [I]nsurance shall determine if the insurer has committed an unfair claim settlement practice under AS 21.36.125.

The legislature's intent was that the Division of Workers' Compensation and the Division of Insurance "strictly enforce . . . the reporting requirements and penalties for noncompliance under AS 23.30.155."[94]

The statute does not mention bad faith; it requires a referral if the Board "determines that the employer's insurer has frivolously or unfairly controverted compensation due under" the Act. The legislature did not define what a frivolous or unfair controversion was, so the Board and later the Commission had authority to interpret those terms. The Commission's interpretation of "frivolous" and "unfair" did not require an assessment of the controversion author's intent: the Commission wrote that "[a] frivolous controversion is not necessarily the product of bad faith conduct by the author."[95] Having interpreted AS 23.30.155(o) in a manner that did not require bad

---

[92]    Ch. 193, § 13, SLA 1959.

[93]    Ch. 79, § 29, SLA 1988.

[94]    Ch. 79, § 1(e), SLA 1988.

[95]    *State, Dep't of Educ. v. Ford*, AWCAC Dec. No. 133 at 21 n.99 (Apr. 9, 2010), http://labor.state.ak.us/WCcomm/memos-finals/D_133.pdf.

faith, the Commission could not expand the statutory requirements and impose an additional element of subjective bad faith.[96]

### 5. The April 2017 controversion was frivolous as the Commission has defined that term.

We now examine the two controversions here. Because Walmart's April 2017 controversion disputed Vue's entitlement to medical care within the first two years after the injury, it needed to have enough evidence to meet the standard set out in *Phillip Weidner & Assocs., Inc. v. Hibdon*.[97] We said in that case that when a "claimant presents credible, competent evidence from his . . . treating physician that the treatment . . . sought is reasonably effective and necessary for the process of recovery, and the evidence is corroborated by other medical experts, and the treatment falls within the realm of medically accepted options, it is generally considered reasonable."[98] If an employee makes this showing, an employer must have evidence the treatment was "*neither* reasonable and necessary, *nor* within the realm of acceptable medical options under the particular facts"[99] of the case. Walmart thus needed to have sufficient evidence

---

[96]     *See London v. Fairbanks Mun. Utils., Emp'rs Grp.*, 473 P.2d 639, 642 (Alaska 1970) (holding that Board's "imposing additional restrictions on the statutory language" was "improper").

As we observed, the Commission's definition of "frivolous" is similar to the "good faith" standard in *Harp*. The *Harp* standard is objective and "does not require an inquiry into the motives of the controversion's author." *Harris v. M-K Rivers*, 325 P.3d 510, 517 (Alaska 2014).

[97]     989 P.2d 727, 732 (Alaska 1999).

[98]     *Id.*

[99]     *Id.* (emphasis added).

both that the medical treatment it controverted was not reasonable and necessary *and* that it was not within the realm of acceptable medical options under the facts of the case.[100]

Vue focuses on Dr. Baer's lack of expertise in pain management to argue that his opinion was not adequate evidence to support a controversion. We have not generally required the Board to give more weight to the opinions of specialists,[101] but the *Hibdon* standard may include consideration of lack of expertise because "[t]he question of reasonableness is 'a complex fact judgment involving a multitude of variables.' "[102] There may be circumstances when, as the Commission said and as Walmart argues, an employer could reasonably rely on a medical doctor's opinion outside of his specialty. A doctor can have training or experience outside of his speciality that can provide an adequate basis for an opinion.[103] But Dr. Baer ultimately testified that he had no basis to dispute several of Dr. McAnally's opinions and that he had no experience with either of the treatments Walmart controverted. Given Dr. Baer's admitted lack of knowledge and experience with the treatments at issue here, his opinion could not as a matter of law

---

[100]    The Commission's paraphrase of the *Hibdon* test in *Ford* is incorrect because the Commission used the disjunctive "or" to set out the test. *Ford*, AWCAC Dec. No. 133 at 29. We overrule that part of the *Ford* decision.

[101]    *Sosa de Rosario v. Chenega Lodging*, 297 P.3d 139, 147 (Alaska 2013) ("We have never held that the opinion of one type of medical specialist is, as a matter of law, entitled to greater weight than that of another.").

[102]    *Hibdon*, 989 P.2d at 732 (quoting *Fluor Alaska, Inc. v. Mendoza*, 616 P.2d 25, 27 (Alaska 1980)).

[103]    For example, in *Sosa de Rosario* the claimant's treating physician was an internist who had practiced for 30 years and testified as to his experience treating patients with back pain and disc problems. 297 P.3d at 144.

provide enough evidence to permit the Board or the Commission to reject Vue's claim for these two treatments.[104]

With respect to Lyrica, two of Vue's treating physicians indicated it would be useful to treat neuropathic pain. Dr. Baer agreed that Lyrica is used to treat pain.[105] Nothing in Dr. Baer's April report indicates that Lyrica was not within the realm of acceptable medical options for treatment of Vue's pain; indeed, Dr. Baer prefaced his opinion that Lyrica was unnecessary with the phrase "[i]n my judgment." And at his deposition, Dr. Baer indicated Lyrica's use was "a judgment call" when asked about his opinion. This is not adequate evidence to support controverting Lyrica under *Hibdon*. When the appropriateness of medical treatment in the first two years after injury is "a judgment call," the choice in treatment is left to the employee and his treating physician.[106]

While Dr. Baer acknowledged that pain is subjective and there was no question Vue was injured, he doubted the level of Vue's pain. He thought the pain's source was the pellet, even though he was aware by April that Dr. McAnally had administered a nerve block and that the results of that nerve block suggested that the pain's source was the infraorbital nerve. At his deposition Dr. Baer stated that he had no basis to dispute Dr. McAnally's diagnosis that the source of Vue's pain was the entry

---

**104**    *See State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Corps., Bus. & Prof'l Licensing v. Wold*, 278 P.3d 266, 272 (Alaska 2012) (holding that expert's "speculation" was not substantial evidence).

**105**    Walmart's assertion that Dr. Baer "opined that the work injury was not the substantial cause of the need for either treatment" is not supported by Dr. Baer's report.

**106**    *Hibdon*, 989 P.2d at 732 ("[W]here a claimant receives conflicting medical advice, the claimant may choose to follow his or her own doctor's advice, so long as the choice of treatment is reasonable.").

wound and the infraorbital nerve, saying, "[I]t's out of my field." Without a basis for the opinion, it was no more than speculation. An expert's speculation is not substantial evidence[107] and could not serve as the basis for a valid controversion.

With respect to pulsed neuromodulation, Dr. Baer's April report contained what can best be described as neutral evidence about pulsed neuromodulation. We indicated in *Harp* that evidence that is at best neutral is not sufficient to support a fact-based contoversion.[108] Dr. Baer wrote that while pulsed neuromodulation was "not widely accepted as a treatment modality," "[m]edical literature suggests that it may be useful in certain cases"; he suggested that Walmart "could" refer the question "to a physician experienced in pain management." After noting the relief Vue got from the temporary nerve block to his infraorbital nerve, Dr. Baer noted the availability of alternative treatments for "longer term or permanent block," but neither identified nor described them. He concluded, "From my knowledge and experience, this treatment modality is neither reasonable nor necessary." These statements do not provide sufficient evidence to support a fact-based controversion because they acknowledged that the treatment was effective in some cases and contained no information about why Dr. Baer thought it would not be useful to Vue. With no factual basis to support it, the controversion was frivolous as defined by the Commission.

Assuming for the sake of argument that the April report had sufficient evidence to support a controversion, Dr. Baer's deposition testimony removed any possible evidentiary value his report might have to controvert pulsed neuromodulation. When asked at deposition, Dr. Baer revealed that he had not heard of pulsed neuromodulation before Walmart inquired and had no experience with it. His knowledge

---

[107] *Wold*, 278 P.3d at 272.

[108] 831 P.2d 352, 358-59 (Alaska 1992).

-40- 7490

came from inquiries to "oculoplastic" surgeons who had "heard of it" and some research. He said that "[his] question is not the treatment but the existence of [Vue's] pain." All of this information should have prompted Walmart to withdraw its April controversion.

### 6. The May 2017 controversion of TTD was frivolous.

Walmart's May 2017 controversion controverted two periods of TTD: April 20 to August 24, 2016 and the period after January 6, 2017. The controversion did not set out any basis for controverting the 2016 period, merely reciting the payment history. The controversion identified Dr. Chang's and Dr. Vincent's "work status report dated 01/05/17, opining employee reached medical stability on that date" to support the controversion of TTD in 2017 and continuing. In its hearing brief Walmart contended Dr. Rosen's 2016 note about Vue's physical capacities supported the termination of TTD in 2016.

With respect to the months in 2016, we note first that the controversion notice itself did not meet the statutory standard of explaining the basis for Walmart's controversion of 2016 TTD.[109] Turning to the reason asserted in its hearing brief, Dr. Rosen's note was not sufficient evidence to support a controversion of TTD because it failed to adequately show that Vue was not disabled by his psychological condition, as set out above. The notice was thus frivolous as defined by the Commission.[110]

The January 2017 work status report limited its opinion about medical stability to the surgery: in response to the question whether Vue "reached medical

---

[109] AS 23.30.155(a)(5) (setting out "the type of compensation and all grounds on which the right to compensation is controverted" as requirement of notice).

[110] *See Kinley's Rest. & Bar v. Gurnett*, AWCAC Dec. No. 121 at 16 (Nov. 24, 2009), http://labor.state.ak.us/WCcomm/memos-finals/D_121.pdf (defining frivolous controversion as one "completely lacking a plausible legal defense or evidence to support a fact-based controversion").

stability from the 2/3/2016 eye injury," the doctors wrote, "Yes, from surgical aspect." Given that Vue continued to receive pain management and psychological treatment related to the injury and that Dr. Wicher's March 2017 report said Vue was not medically stable with respect to his psychological condition, Walmart did not have sufficient evidence to support its factual assertion in the controversion that Vue was medically stable, making the controversion frivolous under the Commission's definition.

### 7. The May 2017 controversion of medical benefits was frivolous.

Walmart's May 2017 controversion also controverted "Medical Benefits . . . which are unnecessary, unreasonable, and/or unrelated to employee's injury of 02/03/16." The reason related to medical benefits was Dr. Baer's April EME about Lyrica and pulsed neuromodulation, but the controversion did not state with specificity what medical treatment was controverted.

A controversion of all medical benefits that are not reasonable or necessary fails to provide notice to anyone what specific benefit is disputed and therefore does not fulfill the basic function of providing notice of what part of a claim is disputed.[111] It also does not provide an explanation of coverage related to the facts of Vue's case that would allow him or a provider to discern whether coverage exists for specific care.[112] We have

---

[111] *See Bockness v. Brown Jug, Inc.*, 980 P.2d 462, 467 (Alaska 1999) (observing that controversion notices of specific medical treatment gave employee adequate notice that employer "did not consider them reasonable and necessary"); *Univ. of Alaska Fairbanks v. Hogenson*, AWCAC Dec. No. 074 at 12 n.68 (Feb. 28, 2008), http://labor.state.ak.us/WCcomm/memos-finals/D_074.pdf ("[T]he purpose of a post-claim controversion is *notice* - to notify the claimant what claimed benefits are contested and why." (emphasis in original) (citing *Groom v. State, Dep't of Transp.*, 169 P.3d 626, 635 (Alaska 2007))).

[112] *Cf.* AS 21.36.125(a)(15) (listing as unfair insurance practice "fail[ing] to promptly provide a reasonable explanation of the basis in the insurance policy in relation (continued...)

construed the Act as requiring employers to provide medical care that is reasonable and necessary,[113] so this controversion in essence provides no information to either the claimant or healthcare providers about what care may be contested or why. A claimant could not decide on the basis of this type of notice whether to pursue a claim.[114] More importantly, controverting a claim or otherwise undermining a claim's status has a documented negative impact on medical care for injured workers. In *Bockus v. First Student Services*, for example, the mere knowledge that an EME was scheduled prompted the treating physician to delay needed surgery.[115]

Dr. Baer's April 2017 report could not provide a factual basis to support a controversion this broad; it only addressed a small number of treatments and only offered opinions about two. We have discussed the evidentiary insufficiency of Dr. Baer's report above. With no factual basis to support it, the May 2017 controversion was frivolous as the Commission has defined that term.

---

[112] (...continued)
to the facts or applicable law for denial of a claim").

[113] *See Bockness*, 980 P.2d at 466.

[114] *Cf. Bailey v. Tex. Instruments, Inc.*, 111 P.3d 321, 325-26 n.10 (Alaska 2005) ("Once an employer controverts a claim, the burden shifts to the employee to prosecute the claim promptly.").

[115] 384 P.3d 801, 806 (Alaska 2016); *see also Phillip Weidner & Assocs., Inc. v. Hibdon*, 989 P.2d 727, 730 (Alaska 1999) (describing delay in getting surgery when employer controverted it); *cf. Rusch v. Se. Alaska Reg'l Health Consortium*, 453 P.3d 784, 788-89 (Alaska 2019) (describing difficulty scheduling surgery when insurer would not preauthorize it).

## V.    CONCLUSION

We REVERSE the Commission's decision and REMAND this case with instructions to remand the case to the Board for calculation of TTD and penalty owed to Vue as well as referral of Walmart's insurer to the Division of Insurance.